# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JAMES MICHAEL FAYED,
Defendant and Appellant.

S198132

Los Angeles County Superior Court
BA346352

---

April 2, 2020

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

---

PEOPLE v. FAYED

S198132


Opinion of the Court by Chin, J.


A Los Angeles County jury found defendant James Michael Fayed guilty of the first degree murder of his estranged wife, Pamela Fayed, (Pen. Code,[1] § 187, subd. (a)) and of conspiracy to commit murder (§ 182, subd. (a)(1)). (As discussed further below, defendant was not the actual killer but arranged for someone to kill Pamela.) The jury further found true the special circumstance allegations of financial gain (§ 190.2, subd. (a)(1)) and lying in wait (§ 190.2, subd. (a)(15)). Following the penalty phase, the jury returned a verdict of death. The trial court denied defendant's automatic application for modification of the verdict (§ 190.4, subd. (e)) and sentenced defendant to death.

This appeal is automatic. (§ 1239.) For reasons that follow, we affirm the judgment in its entirety.

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

## A. Guilt Phase

### 1. Overview

Shortly after initiating divorce proceedings in October 2007, defendant arranged for Pamela Fayed's[2] murder by paying the couple's employee, Jose "Joey" Moya, $25,000 to kill her. Moya, in turn, enlisted Gabriel Jay Marquez, the boyfriend of his niece, and Steven Simmons, Marquez's nephew. On July 28, 2008, Pamela was stabbed to death in a Century City parking garage, moments after she had left a meeting with defendant and their respective attorneys. At the time of her murder, defendant and Pamela were under federal investigation for allegedly laundering money for Ponzi schemes through their e-currency business.

Defendant and Pamela were married in 1999, and had one young daughter, J.F. Pamela's older daughter from a previous marriage, Desiree G., also lived with the family. In or around 2002, the Fayeds started a business, Goldfinger Coin & Bullion (Goldfinger), in Camarillo. Goldfinger was an Internet company that provided money and precious metal transfer services for a fee. They also had an associated company, E-Bullion Company (E-Bullion), which was incorporated in the country of Panama with its business offices in California.

After the financial success of Goldfinger, the family bought a home in Camarillo and a second home on an over 200-acre ranch in Moorpark, which they called "Happy Camp Ranch."

---

[2] To minimize confusion and for the sake of simplicity, we have used first names when necessary. (*People v. Trujeque* (2015) 61 Cal.4th 227, 236, fn. 2.)

Joey Moya, who was hired to assist defendant and to help on the ranch, moved into a second house on the ranch.

In or around April 2007, Pamela spoke with her good friend, Carol Neve, who had a similar e-currency business. After Neve advised Pamela that Goldfinger needed a money transmitting license to comply with federal regulations, Pamela wrote a check for $400,000 on October 6, 2007 to secure a license. Defendant had told Pamela that a license was not required. Defendant filed for divorce in October 2007. He banned Pamela from Goldfinger offices and fired Desiree, who had worked there for two years. In divorce filings, defendant alleged that Pamela had embezzled $800,000 from Goldfinger.

### 2. *Unrelated Federal Investigation of Goldfinger*

In or around early 2008, before Pamela's murder, the United States Attorney's Office led by Assistant United States Attorney (AUSA) Mark Aveis began a formal investigation into Goldfinger for its involvement in a money laundering scheme. In their joint investigation of two Ponzi schemes, the FBI and the IRS discovered that money from these two schemes "was flowing through Goldfinger" and that Goldfinger had made over $9 million in 2002 and upwards of $160 million in 2007. Though defendant and Goldfinger were not directly involved in the Ponzi schemes, the federal government sought an indictment against them "to obtain leverage" with defendant, i.e., to allow the FBI to "monitor the flow of money to his business to ferret out and uncover illegal money transmitting activity."

On February 26, 2008, five months before Pamela's murder, defendant and Goldfinger were indicted on federal charges of operating an unlicensed money transmitting business (18 U.S.C. § 1860). Pamela was not named in the indictment,

which was sealed and not made public. However, in June 2008, after the United States Attorney's Office subpoenaed the accountants involved in auditing the divorce, Pamela learned that Goldfinger and defendant were being investigated by the FBI and IRS.

About a month later, Pamela's first criminal defense attorney, David Willingham, contacted AUSA Aveis and told him that "Pamela wants to come in." Aveis took that comment to mean that Pamela wanted to cooperate in the criminal investigation against defendant and Goldfinger, though there was no understanding, arrangement, or agreement that Pamela would do so. Before Aveis could meet with Pamela, she was killed. At that time, there was no indication defendant knew about the sealed indictment against him; Aveis admitted that the government never got around to putting pressure on defendant to cooperate.

### 3. Murder of Pamela Fayed

On July 28, 2008, the day of the murder, defendant and Pamela met with their respective attorneys to discuss the ongoing federal investigation into their Goldfinger business. The prearranged meeting, which took place at the Century City offices of defendant's former attorney, lasted from 3:30 p.m. until approximately 6:30 p.m. that evening. After the meeting, Pamela returned alone to her car, which was parked on the third floor in the adjacent parking structure. She was stabbed multiple times in the head, neck, and chest and had defensive wounds on her arms. The fatal stab wound was a deep cut to the front of her neck.

Witness Edwin Rivera described the assailant as a tall and skinny male, wearing a black hooded sweatshirt and jeans. Rivera, however, could not see the assailant's face.

### 4. Crime Scene and Murder Investigation

Los Angeles Police Department (LAPD) Detective Eric Spear arrived shortly after Pamela's body was removed from the crime scene. Detective Spear identified a red SUV as a suspect vehicle and obtained an image of the SUV's license plate from one of the parking lot cameras. The SUV was rented from Avis Rent A Car company in Camarillo on behalf of Goldfinger and defendant. Pamela's blood was found in the interior of the SUV, which had been steam cleaned before being returned to the rental company. A fingerprint found on the parking garage ticket matched that of Simmons.

Telephone records showed that cell phones registered to Marquez and Simmons made contact with a cell tower located close to the murder scene at almost the same time as the murder. Records also showed that defendant and Moya exchanged multiple text messages shortly before and after the murder, though the messages were deleted from defendant's phone.

On August 1, several days after Pamela's murder, the federal indictment was unsealed, and defendant was arrested by federal agents. At the time, the other suspects under investigation for the murder (Moya, Marquez, and Simmons) had not yet been arrested.

### 5. Recorded Jailhouse Conversation with Shawn Smith

LAPD Detective Salaam Abdul was assigned to investigate Pamela's murder. On September 9, 2008, Detective

Abdul received word from federal authorities that Shawn Smith, who was sharing a cell with defendant at the men's federal detention center, wanted to speak to police. After meeting with Smith, Detective Abdul arranged for Smith to wear a wire when he returned to the cell he shared with defendant.

In their secretly recorded conversation, defendant told Smith that he had paid Moya to murder Pamela and asked Smith to solicit Smith's fictional hitman "Tony" to kill Moya to eliminate him as a witness. The jury heard the recorded conversation between defendant and Smith in its entirety and also received a written transcript of the conversation. The substance of the conversation is discussed in greater detail below as relevant to the issue defendant raises. (See *post*, at pp. 18-20.)

### 6. *Procedural Background*

On or about September 15, 2008, a complaint charged defendant and codefendant Moya with the first degree murder of Pamela. (§ 187, subd. (a).) It alleged the special circumstance allegations of murder for financial gain (§ 190.2, subd. (a)(1)) and murder by means of lying in wait (*id.*, subd. (a)(15)). Count 2 also charged defendant with one count of conspiracy. (§ 182, subd. (a)(1).) That same day, the United States Attorney for the Central District of California moved to dismiss the federal indictment against defendant.

On August 13, 2010, nearly two years after defendant and Moya were charged with Pamela's murder, the prosecution filed an indictment against coconspirators Marquez and Simmons and filed a notice of joinder of all four defendants a month after. On February 11, 2011, the prosecution filed a notice seeking the death penalty against defendant only. Although the cases were

initially consolidated, the trial court granted defendant's severance motion after the prosecution sought the death penalty against defendant only.[3]

Guilt phase jury deliberations began on May 17, 2011. After deliberating for two days, the jury found defendant guilty of first degree murder and one count of conspiracy to commit murder. It also found true the special circumstance allegations of murder for financial gain and murder by means of lying in wait. After penalty phase deliberations, the jury fixed the penalty at death. Defendant moved to modify the verdict under section 190.4, subdivision (e), which motion the trial court denied. The trial court fixed the penalty at death.

### B. Penalty Phase

#### 1. *Prosecution Evidence*

The prosecution presented victim impact evidence through the testimony of Pamela's two sisters, her brother and his wife, and Pamela's adult daughter, Desiree. Pamela's friends also testified.

---

[3] In a separate trial before the same trial judge, a jury convicted Moya, Marquez, and Simmons of the first degree murder of Pamela, and of conspiracy to commit murder. The jury also found true the special circumstance allegation of murder by means of lying in wait as to all three defendants (§ 190.2, subd. (a)(15)) and the special circumstance allegation of murder for financial gain with respect to Moya only (*id.*, subd. (a)(1)). The trial court sentenced all three defendants to life imprisonment without the possibility of parole for the first degree murder conviction and imposed and stayed a sentence of 25 years to life on the conviction for conspiracy to commit murder. Each defendant appealed. The Court of Appeal affirmed all three judgments in an unpublished opinion.

Pamela's sister testified that while hearing news of Pamela's death was very difficult, hearing details about how she died from witness Edwin Rivera "was by far the hardest thing." Pamela's brother, who became J.F.'s legal guardian, testified that while J.F. knows that her mother was murdered, he did not tell her that her father did it because she still loved her father; Pamela's brother believed J.F. "is the biggest victim of all this."

Over defense objection, the prosecution presented photographs of Pamela and her family, including one of Desiree kneeling over her casket and kissing it. Desiree also read a personal letter that Pamela had left to her and J.F. in the event of her death.

### 2. *Defense Evidence*

The defense called defendant's friend and a former coworker to each testify. His friend described defendant as a hardworking man, a great friend, and a "good person." His former coworker, who had worked with defendant at the Marine Corps Air Station in El Toro, described defendant as "quiet spoken" and "mellow." The defense also called defendant's high school friend, Melanie Jackman, who considered defendant one of her best friends. She testified that sometime before defendant started divorce proceedings, defendant had called Jackman for advice on how to make Pamela happy. Defense counsel attempted to elicit this testimony to show how defendant at one point in time cared for Pamela.

## DISCUSSION

### A. Guilt Phase

#### 1. *Admission of Defendant's Recorded Jailhouse Statement with Shawn Smith*

On appeal, defendant raises numerous claims based on the admission of defendant's surreptitiously recorded jailhouse statement, asserting that its admission constituted error of constitutional dimensions. Specifically, he raises claims based on his Sixth Amendment right to counsel (see *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*)), his Fifth Amendment right to counsel and privilege against self-incrimination, his Fourth Amendment right to be free from unreasonable detention, his rights under the Sixth Amendment's confrontation clause (see *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*)), as well as attendant protections under Evidence Code sections 352 and 1101.

We discuss each challenge in turn.

#### a. *Factual and Procedural Background*

On July 29, 2008, the day after Pamela was killed, defendant was arrested for her murder. After invoking his right to remain silent, defendant refused to speak to investigators and was released two hours later. On August 1, 2008, the federal indictment was unsealed, and defendant was arrested on the federal money licensing violation. Defendant was remanded into federal custody. On September 10, 2008, while in custody, defendant made incriminating statements about Pamela's

murder to his cellmate, Shawn Smith.[4]  Smith was wearing a wire and recorded his conversation with defendant.

Shortly before their conversation was recorded, Smith had told authorities that he was sharing a cell with defendant and that defendant had told Smith that he was involved in murdering his wife. Detective Abdul met with Smith and determined that additional investigation was necessary.  Smith was outfitted with a "wire," a recording device placed in the inside zipper on the crotch area of Smith's pants. Detective Abdul instructed Smith to avoid the appearance of trying to elicit information from defendant and instead to have a regular conversation with him to see if defendant would "go ahead and reveal information that [defendant] had revealed before." Though Detective Abdul could not recall "exactly what [he] said to Mr. Smith," he testified he did not "counsel him on what to say."  He did, however, refer to a "previous conversation" with Smith, based on which Detective Abdul determined there was "no reason" to discuss with Smith what he should say to defendant.

On September 15, 2008, the same day defendant was charged with Pamela's murder, the federal government dismissed its indictment against defendant to avoid interfering

---

[4]    At the time, Smith was in custody awaiting sentencing for a conviction of possession with intent to sell cocaine.  Smith had previously been convicted of: (1) conspiracy to distribute cocaine in 1987 and served 18 months in prison; (2) transporting and possession for sale a controlled substance in 1990; (3) possession of a controlled substance with the intent to sell in 2003; (4) driving under the influence and hit and run in 2003; and (5) hit and run in 2006.   These convictions were introduced into evidence to impeach Smith's credibility.

with the state's murder investigation of defendant. Around the same time, although Smith was "facing a fairly substantial prison term," he was released on unsecured bond and was later released early from custody. Detective Abdul, however, later testified that Smith's release "had nothing to do with the state crime that [defendant] was charged with."

Before and during his trial, defendant made several unsuccessful challenges to the admission of his recorded jailhouse statement. The prosecution played the entire tape-recorded statement to the jury. On September 12, 2011, after the jury returned a guilty verdict, defendant filed a motion for a new trial, in which he argued that the prosecution's decision to rely on the recorded statement and not to call Smith to testify violated defendant's rights under *Crawford*. The trial court denied the motion.

### b. *Defendant's Sixth Amendment Right to Counsel;* Massiah *Error*

On appeal, defendant argues that even though he had not yet been charged for Pamela's murder, his Sixth Amendment right to counsel had attached when he was in federal custody for the money licensing violation. On that point, he asserts the federal and state prosecutions were "inextricably intertwined" and that the federal prosecution was a "sham" to hold defendant in custody while state authorities investigated the murder case against defendant. Defendant maintains that because Smith was acting as an agent for the government, any statements Smith elicited from defendant were inadmissible under *Massiah*. For reasons that follow, we deny this claim.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the

assistance of counsel for his defense." (U.S. Const., 6th Amend.; see *Massiah*, *supra*, 377 U.S. at p. 206.) This constitutional protection "guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." (*Maine v. Moulton* (1985) 474 U.S. 159, 176; see *Massiah*, *supra*, 377 U.S. at p. 206.) The "clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." (*Brewer v. Williams* (1977) 430 U.S. 387, 401.)

The high court has "pegged commencement to ' "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' " (*Rothgery v. Gillespie County* (2008) 554 U.S. 191, 198 (*Rothgery*); see *Kirby v. Illinois* (1972) 406 U.S. 682, 689-690.) Likewise, we have held that the Sixth Amendment right to counsel "does not exist until the state initiates adversary judicial criminal proceedings, such as by formal charge or indictment." (*People v. DePriest* (2007) 42 Cal.4th l, 33 (*DePriest*); see *People v. Viray* (2005) 134 Cal.App.4th 1186, 1194.)

By its terms, the Sixth Amendment right to counsel is "offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced . . . ." (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 175 (*McNeil*); see *Rothgery*, *supra*, 554 U.S. at p. 198; *People v. Cunningham* (2015) 61 Cal.4th 609, 648; *Maine v. Moulton* (1985) 474 U.S. 159, 180.) The high court has made clear that there is no exception to this offense-specific requirement for uncharged offenses that are " ' "closely related" ' " to or " ' "inextricably intertwined" ' " with the charged offense. (*Texas v.*

*Cobb* (2001) 532 U.S. 162, 173; see *People v. Slayton* (2001) 26 Cal.4th 1076, 1082-1083.) That said, "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, *even if not formally charged*, would be considered the same offense under the *Blockburger* test."[5] (*Texas v. Cobb*, *supra*, 532 U.S. at p. 173, italics added.)

Here, the state prosecution for Pamela's murder had not yet commenced when defendant, who was in federal custody for the unrelated money licensing charge, made the incriminating remarks to Smith. Contrary to defendant's suggestion, we have expressly endorsed, in recognition of the offense specific requirement, a "bright-line precharging rule against attachment of a Sixth Amendment right." (*DePriest*, *supra*, 42 Cal.4th at p. 34.) Thus, "[a] defendant's incriminating statements about offenses for which he has not been charged may be admitted consistently with his Sixth Amendment counsel guarantee notwithstanding its attachment on other charged offenses at the time." (*Id.* at p. 33.) Defendant fails to persuade why the "bright-line precharging rule against attachment of a Sixth Amendment right" (*DePriest*, *supra*, 42 Cal.4th at p. 34), should not apply here.

---

[5] Under *Blockburger v. United States* (1932) 284 U.S. 299, " 'the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' " (*Texas v. Cobb*, *supra*, 532 U.S. at p. 173, quoting *Blockburger*, *supra*, 284 U.S. at p. 304.) As such, the high court also described the "Sixth Amendment as '*prosecution* specific,' insofar as it prevents discussion of charged offenses as well as offenses that, under *Blockburger* could not be the subject of a later prosecution." (*Texas v. Cobb*, *supra*, 532 U.S. at p. 173, fn. 3, italics added.)

For instance, notwithstanding the Sixth Amendment's "offense specific" requirement (*McNeil, supra,* 501 U.S. at p. 175), defendant insists that state and federal authorities had "worked collectively" to ensure that defendant was detained without bail in the federal case, thus making the federal licensing charge "inextricably intertwined" with the state murder charge. In support, defendant relies on principles underlying the dual sovereignty doctrine in the *Fifth* Amendment double jeopardy context. (See *Gamble v. United States* (2019) __ U.S. __, ___[139 S.Ct. 1960, 1964] (*Gamble*) ["Under this 'dual-sovereignty' doctrine, a State may prosecute a defendant under state law even if the Federal Government has prosecuted him for the same conduct under a federal statute"].) Specifically, defendant emphasizes that the high court left open the possibility that double jeopardy principles may ban a successive state prosecution that serves as a "sham and a cover" for the federal prosecution. (*Bartkus v. Illinois* (1959) 359 U.S. 121, 124 (*Bartkus*).)

By analogy, defendant argues that the federal prosecution for the licensing violation was in fact a "sham" used to detain defendant while the state investigated Pamela's murder. He maintains, therefore, that his arrest and federal detention prohibited any questioning on the state murder case. Even assuming that the dual sovereignty doctrine applies in the Sixth Amendment context (see *U.S. v. Coker* (1st Cir. 2005) 433 F.3d 39, 45), and further, that the sham prosecution serves as a "potential exception" to this doctrine (*Gamble, supra,* 139 S.Ct. at p. 1994, fn. 3 (dis. opn. of Ginsburg, J.)), we conclude defendant's claim lacks merit.

As noted, the sham prosecution theory only applies to provide defendant relief if there were successive prosecutions by

two sovereigns for the *same* offense. (See *Gamble*, *supra*, 139 S.Ct. at p. 1964 [affirming dual sovereignty doctrine].) Here, the offenses—Pamela's murder and the federal licensing charge— were clearly not the same. In fact, at his federal detention proceedings, defendant argued that the federal licensing charge and the as-yet charged murder were "unrelated" and "disconnected."

Nevertheless, we agree with defendant that both federal detention hearings focused heavily on facts surrounding Pamela's murder and defendant's possible involvement. To the extent defendant argues that federal and state authorities "worked collectively" to have him detained in federal custody, i.e., through sharing information about the murder and providing a "detention script" prepared by the LAPD, this level of cooperation and collaboration simply represents the "conventional practice between the two sets of prosecutors throughout the country" (*Bartkus*, *supra*, 359 U.S. at p. 123).

"As *Bartkus* makes plain, there may be very close coordination in the prosecutions, in the employment of agents of one sovereign to help the other sovereign in its prosecution, and in the timing of the court proceedings so that the maximum assistance is mutually rendered by the sovereigns. None of this close collaboration amounts to one government being the other's 'tool' or providing a 'sham' or 'cover.' " (*U.S. v. Figueroa-Soto* (9th Cir. 1991) 938 F.2d 1015, 1020.) Further, even if state authorities deliberately delayed arresting defendant for Pamela's murder, which purportedly gave them more time in which to elicit defendant's incriminatory statements in federal custody, this "conscious delay" does not violate his Sixth Amendment right to counsel. (*People v. Webb* (1993) 6 Cal.4th 494, 527 [no *Massiah* violation where investigators told wife to

15

"intensify her questioning" of defendant about capital crimes while defendant was incarcerated on unrelated charges].)[6]

Finally, defendant relies on *Elkins v. United States* (1960) 364 U.S. 206, to argue specifically that concepts of due process and fundamental fairness dictate that his Sixth Amendment right to counsel had attached. Not so. *Elkins*'s abrogation of the "silver platter" doctrine—which previously allowed evidence obtained by a state agent's unreasonable searches or seizures to be used in a federal trial—does not have any application here. (*Elkins*, *supra*, 364 U.S. at p. 222.) As discussed above, we reject defendant's assertion that federal authorities acted improperly in detaining defendant; thus, the high court's concerns of "subterfuge and evasion with respect to federal-state cooperation in criminal investigation" are not realized in this case. (*Ibid.*)

Based on these reasons, we reject defendant's claim that his Sixth Amendment right to counsel had attached to the uncharged murder when he made the incriminating statements in federal custody. (See *Texas v. Cobb*, *supra*, 532 U.S. at p. 173.)

---

[6] Because it is clear that defendant's Sixth Amendment right had not attached when he made the incriminating statements to Smith, it is unnecessary to address, for purposes of defendant's *Massiah* claim, whether Smith "(1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements." (*In re Neely* (1993) 6 Cal.4th 901, 915.) Whether Smith's allegedly coercive actions rendered defendant's statements involuntary, however, is an issue we discuss below. (See *post*, at pp. 18-20.)

### c. *Defendant's Fifth Amendment Right Against Self-incrimination*

Defendant also claims that when authorities placed Smith in defendant's cell to ask him pointed questions about Pamela's murder, this violated his Fifth Amendment right to remain silent. (U.S. Const., 5th Amend. ["nor shall [any person] be compelled in any criminal case to be a witness against himself"]; Cal. Const., art. I, § 15; see *Miranda v. Arizona* (1966) 384 U.S. 436; *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.) Specifically, defendant maintains that he invoked his Fifth Amendment right to counsel when taken into federal custody for the money licensing violation and that he thereby invoked his Fifth Amendment right as to this murder case.

We agree with defendant that unlike the Sixth Amendment right to counsel, his Fifth Amendment right is *not* offense specific. (*Arizona v. Roberson* (1988) 486 U.S. 675, 685.) That said, even if defendant properly invoked his Fifth Amendment right to counsel on July 29 when first arrested for Pamela's murder the intervening passage of time along with defendant's release and break in custody meant that his invocation did not remain in force on September 10 when he made the incriminating statements to Smith. Further, the high court has held that at least where no prior invocation is in effect, "'[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes is a fellow inmate. Coercion is determined from the perspective of the suspect." (*Illinois v. Perkins* (1990) 496 U.S. 292, 296.) In other words, "*Miranda* forbids coercion, not mere strategic deception by taking

advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. . . . [¶] *Miranda* was not meant to protect suspects from boasting about their criminal activities in front of people whom they believe to be their cellmates." (*Id.* at pp. 297-298 [defendant showed "no hint of being intimidated by the atmosphere of the jail" and "was motivated solely by the desire to impress his fellow inmates"]; see *People v. Tate* (2010) 49 Cal.4th 635, 685-686.)

Defendant briefly asserts that Smith was a government agent who used coercive, deceptive, and overreaching tactics to elicit defendant's incriminating statements in violation of due process. (See *Miller v. Fenton* (1985) 474 U.S. 104, 110 [notwithstanding *Miranda*'s prophylactic protections, "the Court has continued to measure confessions against the requirements of due process"]; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 288 ["fear of physical violence, absent protection from his friend (and Government agent) . . . motivated Fulminante to confess"].) "The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088; see *People v. Mickey* (1991) 54 Cal.3d 612, 649-650.) " 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's " will was overborne at the time he confessed." ' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.)

Though the details of their conversation prior to Smith wearing a wire are unknown, it is clear that defendant and Smith had already talked about enlisting Smith's made up hitman, "Tony," to kill Moya. While Smith may have prodded

defendant to speak at times, the record does not support that defendant's will was overborne when he expressed he wanted Moya killed.

For instance, defendant told Smith he did not "want to be worrying about this every fuckin' minute of the day when I'm out there" and that he did not want to "sit around here for the rest of my life and worry about whether one of them is gonna fuckin' finally decide to fess up." Defendant purportedly drew Smith a detailed layout of his ranch to ensure the hitman went to the right house to kill Moya. Further, when an officer passed their cell as defendant and Smith were discussing these plans, defendant remarked: "We're planning a fucking multiple homicide bitch. Leave us alone."

Our review of the recorded conversation reveals several instances where Smith asked defendant specific, and arguably leading, questions about Pamela's killing, including probing whether it was defendant's idea to take the company's rented car which was used in the killing. Smith also appeared to ingratiate himself by expressing sympathy for defendant and commiserating with defendant on how Moya and his cohorts bungled Pamela's murder. As the conversation went on, however, defendant confessed he wanted to kill Pamela himself, but "knew I'd never fuckin' be able to get away with it. Never."

Certainly, Smith was much more than a passive listener. That said, we cannot conclude that Smith's questions or tactics were likely to procure an untrue statement or were otherwise improper. (See *Arizona v. Fulminante*, *supra*, 499 U.S. at p. 287 [coercion due to "credible threat of physical violence" if defendant did not confess].) Though at times Smith coaxed and prodded defendant when he hesitated to speak, it is clear from

the record as a whole that defendant was neither compelled into revealing his role in Pamela's murder, nor was he coerced into hiring a hitman to kill Moya. If the " 'decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.' " (*U.S. v. Miller* (9th Cir. 1993) 984 F.2d 1028, 1031.)

### d. Defendant's Fourth Amendment Right Against Unlawful Search and Seizure

Defendant argues that pursuant to the Bail Reform Act of 1984 (18 U.S.C. § 3142(f)), he should have been released on bail after his arrest on the federal licensing charge. Instead, because he was denied bail and remained in custody, that detention was unlawful, and any statements he made to Smith during that detention should be suppressed under the Fourth Amendment. Even assuming defendant was erroneously denied bail, he fails to demonstrate that the remedy for any violation of the Bail Reform Act of 1984 is to suppress the subsequent confession of the defendant. (See *United States v. Leon* (1984) 468 U.S. 897, 916 ["exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates"]; see also *Hudson v. Michigan* (2006) 547 U.S. 586, 591 ["Suppression of evidence, however, has always been our last resort, not our first impulse"].) As such, we deny this claim.

### e. Defendant's Right to Confrontation

On May 11, 2011, with one remaining witness left to testify at the guilt phase, the prosecution informed the trial court that they would *not* be calling Smith to the stand. The trial court permitted the prosecution to lay the foundation for the recorded conversation between Smith and defendant through Detective Abdul's testimony. Detective Abdul testified

that he placed a recording device on Smith's person. After defense counsel recounted Smith's criminal history, Detective Abdul replied he did not know "how extensive his criminal history was." Detective Abdul denied offering Smith any advantage or reward for cooperating with authorities and also denied counseling Smith on what to say to defendant. However, the detective admitted he knew that at the time of the recorded conversation, Smith was awaiting sentencing and "facing a fairly substantial federal prison term" after pleading guilty to selling cocaine to an undercover agent.

After Detective Abdul testified, the jury heard (and later received a transcript of) the entirety of the recorded conversation. In admitting the transcript and tape of the recorded conversation into evidence, the trial court concluded Smith's statements were not being offered for the truth of the matter asserted and were, therefore, admissible as nonhearsay. As to defendant's recorded statements, the trial court found that while the statements constituted hearsay, they were admissible under the exception for an admission against penal interest.

Outside the presence of the jury, defense counsel raised a "standing objection"—i.e., referring to previously raised objections based on the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution—to the admission of the recorded conversation between Smith and defendant. Defense counsel also specifically raised a hearsay objection based on *Crawford, supra,* 541 U.S. 36 and requested that the court give a clarifying instruction on the jury's permitted use of Smith's statements. The trial court told defense counsel to draft an appropriate instruction, which the court said it would take up later.

On appeal, defendant focuses on Smith's statements, the admission of which he claims violated his Sixth Amendment right of confrontation and the restrictions against testimonial statements. (*Crawford*, *supra*, 541 U.S. at p. 59; U.S. Const., 6th Amend. ["In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"]; see Cal. Const., art. I, §§ 7, 14 & 15.) Claiming prejudice, defendant asserts Smith's statements were the "force majeure" of the prosecution's case, without which there would be little evidence against defendant.

Generally speaking, a declarant's hearsay statement is testimonial if made "with a primary purpose of creating an out-of-court substitute for trial testimony." (*Michigan v. Bryant* (2011) 562 U.S. 344, 358.) Notwithstanding the lack of a comprehensive definition of "testimonial" (*Ohio v. Clark* (2015) __ U.S. __, __ [135 S.Ct. 2173, 2179]), the high court has nonetheless emphasized that only hearsay statements that are "testimonial" are subject to the confrontation clause. (*Davis v. Washington* (2006) 547 U.S. 813, 821; *Crawford*, *supra*, 541 U.S. at p. 53 ["even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object"].) "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington, supra*, 547 U.S. at p. 821; see *People v. Cage* (2007) 40 Cal.4th 965, 984.) The admission of *nonhearsay* statements, it follows, "raises no Confrontation Clause concerns." (*Tennessee v. Street* (1985) 471 U.S. 409, 414; see *Crawford, supra*, 541 U.S. at p. 59, fn. 9; *People v. Cage, supra*, 40 Cal.4th at p. 975, fn. 6; Evid. Code, § 1200.)

With this legal backdrop, we have set out a two-step inquiry to determine the admissibility of out-of-court statements in criminal cases:  "The first step is a traditional hearsay inquiry:  Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception?  If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required.  Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680; see *People v. Blacksher* (2011) 52 Cal.4th 769, 811 (*Blacksher*).)

In the context of an interrogation, as used in the colloquial and not legal sense, " 'it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.' . . .  An interrogator's questions, unlike a declarant's answers, do not assert the truth of any matter." (*Michigan v. Bryant, supra,* 562 U.S. at p. 367, fn. 11, quoting *Davis v. Washington, supra,* 547 U.S. at p. 822, fn. 1.)  In that regard, the high court has also noted that statements made unknowingly to an informant or statements between fellow prisoners are "clearly nontestimonial."  (*Davis v. Washington,* at p. 825, citing *Bourjaily v. United States* (1987) 483 U.S. 171, 181-184, *Dutton v. Evans* (1970) 400 U.S. 74, 87-89 (plur. opn. of  Stewart, J).)

In this case, the prosecution maintained that statements by Smith, an undercover informant who befriended defendant in federal detention and prompted him to confess to Pamela's murder, were not hearsay in the first place because Smith's statements were not offered for the truth of the matter asserted.

For example, in response to defense counsel's argument that it was Smith who "leads and cons, and . . . directs" defendant to confess, the prosecution relied on Smith's statements to show that Smith did not threaten or intimidate defendant into making incriminating statements. Smith's statements were nonhearsay and admissible to put defendant's "admissions on the tapes into context, making the admissions intelligible for the jury. Statements providing context for other admissible statements are not hearsay because they are not offered for their truth." (*U.S. v. Tolliver* (7th Cir. 2006) 454 F.3d 660, 666, fn. omitted.)

Though conceding that the statements were originally admitted for this nonhearsay purpose, defendant claims that the prosecution "repeatedly used Smith's statements for the truth of the matter by arguing that the jury should find Smith's taped statements to be credible." We reject this claim. Contrary to defendant's contention, by telling the jury, "[I]s there anything that makes you suspect that Shawn Smith is not being truthful? No because you can hear every syllable that comes out of his mouth," the prosecution was not vouching for Smith's credibility. Impermissible vouching " ' "involves an attempt to bolster a witness by reference to facts *outside the record*." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206, italics added.)

Here, the prosecution urged the jury to focus on the admissible evidence: "I am not asking you to take Shawn Smith's word for anything. I am not saying, yeah, Shawn Smith says that James Fayed said this. You can hear for yourself on the DVD, on the tape." Moreover, the issue was not the truth or falsity of Smith's statements—for instance, whether Smith actually knew a hitman named "Tony" who would kill Moya if defendant wanted—but whether Smith had made the

statements. Out-of-court statements are inadmissible hearsay "only when they are offered for the same purpose as testimony of a witness on the stand *and therefore depend for probative value on the credibility of the declarant.*" (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 5, p. 788, italics added.) In the strictest sense, Smith's credibility was not at issue because his out-of-court statements were not offered for their truth.

It bears emphasis that both sides thoroughly discussed Smith's credibility (or lack thereof) at trial. When cross-examining Detective Abdul, defense counsel underscored Smith's "extensive criminal history," and recounted each of Smith's convictions. In closing argument, defense counsel called Smith: "Drug addict. Convicted. Felon in possession of firearms. Drunk driver. Hit and run driver." In conclusion, defense counsel submitted: "[T]his man is no good. This man is evil. And no good comes from evil."

For its part, the prosecution was not "hiding" the fact that Smith was a convicted drug dealer. Far from vouching for Smith's credibility, the prosecution conceded that Smith was not a trustworthy individual but was instead, in the prosecution's words, "a crook and a criminal." Nevertheless, as the prosecution emphasized, the recorded conversation spoke for itself: "It wouldn't matter who was in the cell next to [defendant]. Mr. Fayed, it is his words that are being used against him." Moreover, regarding any motive for Smith to lie, the jury heard that while Detective Abdul denied that he offered Smith any benefit in exchange for recording his conversation with defendant, Detective Abdul admitted he was aware that Smith was released early after cooperating with authorities.

### f. Failure To Redact Recorded Conversation

In his pretrial motion in limine to exclude the entire recorded conversation with Smith, defendant alternatively requested that the trial court redact the statement if admitted. He challenged the conversation's references to hiring a hitman to kill Moya, certain "inflammatory" remarks Smith made, and statements defendant made on other "extraneous matters," such as defendant's sex life, his meetings with the National Security Agency, and his admitted forgeries of Pamela's will and counterfeit $100 bills. The trial court rejected defendant's request, noting that the entire recorded conversation had probative value: "Now you can make your argument that it is an Oscar award-winning performance and it was not worth anything, but I think the People are entitled to bring that, in all of its glory, in front of the jury."

On appeal, defendant argues that the trial court's ruling was erroneous and that the admitted evidence was extraneous, inflammatory, and ultimately prejudicial to him. "A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.)

As their recorded conversation revealed, defendant and Smith spent much time talking about defendant hiring a purported hitman Smith knew named "Tony" to kill Moya. (See *ante*, at pp. 19-20.) Defendant argues that the evidence of the uncharged conduct about hiring a hitman to kill Moya was inadmissible because he was never charged with a postoffense crime against Moya. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405.) Even if admitted for a proper purpose to show defendant's consciousness of guilt, he maintains that the evidence was unduly prejudicial under Evidence Code section

352. The evidence, defendant adds, was also "insubstantial and undependable" because it was *Smith* who "encouraged and prodded" defendant to hire a hitman Smith knew to kill Moya. Finally, this evidence purportedly showing defendant's consciousness of guilt as to Pamela's murder was cumulative because the conversation already included defendant's statements about killing Pamela. We reject this claim on all points.

Here, the prosecution's theory was that defendant perpetrated Pamela's murder by soliciting Moya (who in turn enlisted Marquez and Simmons) to kill Pamela. Thereafter, because of fears that Moya could turn on defendant and become a witness against him, defendant sought to hire another hitman, Smith's fictional friend, "Tony," to kill Moya; in that regard, Smith took care to portray Tony as dying of cancer and therefore not a risk to defendant after killing Moya. This evidence of defendant soliciting the murder of a potential witness is highly probative of defendant's guilt of Pamela's murder. Contrary to defendant's contention, this evidence was not cumulative. Rather, it showed a common plan in that defendant sought to kill whoever threatened him or his livelihood. (See *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

Though the record does not disclose how the two first discussed the idea of defendant hiring a hitman (see *ante*, at p. 18) and defendant appeared reluctant at times when discussing the plans, defendant's assertion that the evidence, therefore, was insubstantial or undependable lacks merit. Although Smith may have prodded or coaxed defendant to talk at certain points, defendant's initial hesitation gave way to extended diatribes of how Moya and others bungled previous attempts to kill Pamela and how defendant did not want to be worried that

27

Moya would turn on him. Moreover, any hesitation could be attributed to defendant seeking Smith's assurances that Tony would be more competent and effective than Moya. Defendant also admitted he would have killed Pamela himself but that he would never "get away with it. Never."

We also reject defendant's challenge to the other admitted evidence. Smith's pejorative references to Mexicans and women were brief and were not inflammatory; in any event, defendant fails to show how *Smith*'s offensive statements—to which defendant showed little reaction—would prejudice defendant. Likewise, defendant fails to show how Smith's bravado and graphic details about hiring hitmen to commit various murders would prejudice defendant. Finally, any extraneous details, such as the forging of the will, lent credibility to defendant's admissions because he trusted Smith enough to reveal this information.

In sum, we conclude the trial court did not abuse its discretion in denying defendant's motion to redact the statement and admitting it in its entirety.

### 2. *Jury Misconduct*

Before the close of the guilt phase and in the span of one week, the trial court received several anonymous e-mails and voicemail messages alleging various instances of jury misconduct. The trial judge later remarked she had "never experienced anything like this" in her over 22 years' experience on the bench.

The events were as follows: On May 9, 2011, after getting a voicemail on the court's telephone from an unnamed juror about possible juror misconduct, the trial court questioned all jurors and alternate jurors, but no one acknowledged leaving the

voicemail. Two days later, the court received a note from Juror No. 5 admitting that he left the voicemail. The note explained that he had observed Juror No. 11 and Alternate Jurors No. 1 and 4 discussing "at length" the testimony of witness Edwin Rivera, who gave aid to Pamela after she was stabbed. When questioned alone by the court, Juror No. 5 explained he heard the three talk about the graphic photos the prosecution showed to witness Rivera and described how brave Rivera was, but remarked how cruel defendant was and how his actions led to his wife's death. Juror No. 5 said that what he heard would not affect his ability to be fair and impartial.

When the trial court questioned Juror No. 11 and Alternate Jurors No. 1 and 4 separately about this, all three steadfastly denied discussing the case with other jurors. The court subsequently questioned all jurors and alternate jurors about whether they (or anyone else) had formed any opinion about defendant's guilt or innocence. Alternate Juror No. 3 stated she heard Juror No. 11 tell another juror, "Once I make up my mind, I don't change it"; according to Alternate Juror No. 3, she thought that Juror No. 11 had "made up her mind that the defendant is guilty." The trial court excused Juror No. 11 and Alternate Juror No. 1; the court refused to excuse Alternate Juror No. 4. The court opined that Juror No. 5 was likely referring to Alternate Juror No. 3 and not Alternate Juror No. 4 as having the conversation with Juror No. 11. After a random drawing of the remaining alternate jurors, Alternate Juror No. 4 was chosen to replace excused Juror No. 11.

Next, on May 12, 2011, defense counsel informed the court he received an anonymous e-mail sent to his law firm e-mail address the night before. The e-mail expressed concern that defendant get a fair trial and urged the court to remind jurors

not to express opinions or search the Internet about the case. The trial court told the jurors that whoever had sent the e-mail should contact the bailiff; however, no juror approached the bailiff. That same day, the court learned of a voicemail left by an anonymous female caller who explained that jurors, specifically mentioning Juror No. 6 and Juror No. 9, were continuing to look things up on the Internet. Also, Juror No. 3 later wrote a note to the court explaining there was an "air of suspicion and doubt among the jurors as we near deliberations" because of the anonymous e-mail. Because the voicemail appeared to be from a female, the trial court first questioned separately the remaining female jurors on the panel whether anyone had left the voicemail or had sent the e-mail to counsel. The court next questioned the male jurors only if they had sent the e-mail to defense counsel.

The trial court summarized the state of the record: "[E]very single juror and alternate juror has denied sending the e-mail to Mr. Werksman's office, has denied leaving the voicemail on the court's telephone." It further noted that every juror and alternate juror indicated they had not heard any juror forming or expressing opinions regarding the case. The court concluded there was not sufficient evidence to conclude that any of the jurors or alternate jurors has engaged in misconduct. The court added it was "satisfied that these jurors are prepared to live up to the oath that they all took initially and that they've reacknowledged today and that we're going to move forward."

Finally, on May 17, 2011, defense counsel brought in a letter he received, which enclosed a campaign brochure and cover letter from Prosecutor Alan Jackson, running for Los Angeles County District Attorney. The letter raised the concern that several jurors had received these materials. After first

requesting the court ask the sheriff's department to launch a formal investigation into these attempts to undermine the judicial process, Jackson agreed with defense counsel that the trial court should ask the jury about the mailer. After no juror replied that they had seen the mailer, the trial court explained that "there is someone out there that's trying to cause trouble" and admonished the jury to be "extremely vigilant" and to let the court know if they receive any information or correspondence.

In summary, after its investigation, the trial court concluded there was one instance of jury misconduct, i.e., the reported conversation between Juror No. 11 and Alternate Juror No. 1 (and presumably Alternate Juror No. 3), in which Juror No. 11 expressed her opinion of defendant's guilt. The trial court excused Juror No. 11 and Alternate Juror No. 1, and defendant does not challenge the trial court's discharge of either juror. Nor does he repeat his claim that the court should have also excused Alternate Juror No. 4. Rather, defendant asserts that the misconduct raised the presumption of prejudice and that the trial court's investigation into the misconduct was "incomplete." He suggests the inadequate investigation "is, itself, enough to warrant reversal." His claim in essence is that the presumption of prejudice was not rebutted. We reject defendant's claims as contrary to the facts and relevant law.

A criminal defendant is constitutionally entitled to an unbiased, impartial jury. (*People v. Weatherton* (2014) 59 Cal.4th 589, 598.) "Jurors must be admonished not to 'form or express any opinion about the case until the cause is finally submitted to them.' (§ 1122, subd. (b).) Prejudgment 'constitute[s] serious misconduct' [citation], raising a presumption of prejudice. The presumption is rebutted 'if the

entire record . . . indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' " ( *Ibid.*)

"Whether and how to investigate an allegation of juror misconduct falls within the court's discretion. [Citation.] Although a court should exercise caution to avoid threatening the sanctity of jury deliberations, it must hold a hearing when it learns of allegations which, if true, would constitute good cause for a juror's discharge. [Citation.] Failure to do so may be an abuse of discretion." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69-70; see *People v. Espinoza* (1992) 3 Cal.4th 806, 822 [inquiry should be sufficient " ' "to determine if the juror should be discharged and whether the impartiality of other jurors had been affected" ' "].) Grounds for investigating or discharging a juror may be based on the juror's statements or conduct, including events which occur during jury deliberations and are reported by fellow jurors. (*People v. Lomax* (2010) 49 Cal.4th 530, 588.)

In this case, the alleged conversation took place before the jury deliberations began in the guilt phase. Rather than immediately question all the jurors about the voicemail, the trial court preferred to take what it described as a "conservative" approach to see if someone would acknowledge the call. Notwithstanding the court's initial reticence, once Juror No. 5 revealed he had left the voicemail message, the trial court promptly investigated the allegations of juror misconduct. Far from perfunctory, the trial court's questioning was thorough and careful, focusing on the nature and scope of the reported misconduct.

We conclude that any presumption of prejudice was rebutted; in other words, there was no substantial likelihood that any sitting or alternate jurors were actually biased against defendant. (*People v. Weatherton, supra,* 59 Cal.4th at p. 598.) In addition to excusing the two jurors, the trial court questioned the remaining jurors and alternate jurors, who all replied they were able to fulfill their duties as jurors and agreed not to form or express any opinion about the case until the matter was submitted.

Nevertheless, defendant asserts that Juror No. 5 "lied" about leaving the voicemail or observing misconduct when questioned with the jury as a whole. Juror No. 5 later explained he felt embarrassed about raising his hand in front of everyone; he instead wrote a note and handed it to the bailiff on his way out of the courtroom. Except for his initial hesitation, Juror No. 5 was forthcoming and detailed in his account. Alternate Juror No. 3 presumably felt the same feelings of embarrassment when questioned in a group, but also gave a detailed account of the conversation when questioned individually. Indeed, after the questioning ended, defense counsel concluded that Juror No. 5 was "credible and honest" and likewise characterized Alternate Juror No. 3 as "honest."

With respect to the remaining alleged incidents of juror misconduct—as reported in the anonymous voicemail from a female juror left on the court's telephone, the anonymous e-mail sent to defense counsel, and the letter with the campaign mailer of prosecutor Jackson sent to defense counsel's law firm—we conclude the trial court's inquiry was sufficient and agree with its conclusion that these allegations of juror misconduct were not credible. For the same reasons, we reject defendant's claim that the trial court abused its discretion in denying defendant's

motion for a new trial based on jury misconduct (§ 1181, subd. 3). (See *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [" 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears' "]; see also *People v. Dykes* (2009) 46 Cal.4th 731, 809 [regarding motion for new trial based on jury misconduct "reviewing court should accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence"].)

On appeal, defendant raises no new arguments regarding any alleged misconduct, except to note that the court's assumption that defendant was responsible for the misconduct was "sheer speculation." Because the trial court found no such misconduct, it is, of course, unnecessary for us to dispel whether defendant was the source.

### 3. *Instructional Errors*

#### a. *Third Party Culpability*

Before trial, defendant indicated he intended to call his sister, Mary Mercedes, as a witness to question her if she had attempted to solicit their sister Patty Taboga's husband, Kurt, to kill Pamela. Defendant's theory was that it was Mercedes and not defendant who solicited Pamela's murder. Outside the presence of the jury, Mercedes invoked her Fifth Amendment right not to incriminate herself, after which the court declared her unavailable as a witness. Based on Mercedes's unavailability, the trial court permitted defendant to question Taboga about her conversation with Mercedes.

Appearing under a defense subpoena, Taboga testified that Mercedes had called her sometime around May 2008,

several months before Pamela was killed. Mercedes asked Taboga if Taboga's husband, a police officer in Wyoming, would kill Pamela because " 'money was running out' " due to defendant and Pamela's divorce. Taboga was shocked and told Mercedes that she had "lost her mind" and asked how Mercedes could call her with such a "horrible request." Taboga testified that after speaking for some time, Mercedes said she had a "temporary loss of sanity" and asked that Taboga not tell anyone. Taboga did not immediately tell defendant, Kurt Taboga, or anyone else, about the telephone conversation.

Several years later, on or about March 9, 2011, while defendant was in custody awaiting trial for Pamela's murder, Taboga wrote him a letter describing her conversation with Mercedes. Only then did defense counsel purportedly first become aware of this information. In explaining why she came forward just 32 days before testifying, Taboga said it was "the first time anyone's asked me anything." Taboga did not believe she had important information that "could free" defendant but felt "all the facts need to get out." On cross-examination, Taboga explained that after her conversation with Mercedes, she did not tell Pamela she was in grave danger because she believed Mercedes "wasn't going to do anything and she just lost her mind temporarily." She also revealed she had not spoken to Mercedes since 2010 after they had a heated argument.

After Taboga testified, defendant requested the court give a special instruction on third party culpability to highlight evidence suggesting that "other persons, among them Mary Mercedes, committed the crimes charged" and that defendant "is entitled to an acquittal if the evidence raises a reasonable doubt in your mind as to the defendant's guilt." Although the prosecution agreed that Taboga's testimony was admissible, it

argued the proposed instruction was improper because it not only highlighted the significance of the evidence for the jury, but the instruction also suggested that if the jury believed Taboga, there is reasonable doubt as to defendant's guilt; in short, the instruction "almost directs the verdict to not guilty or an acquittal." After defense counsel orally suggested possible revisions to their special instruction, the prosecution countered that no such instruction was required because CALJIC No. 2.90 already explains that the prosecution has the burden of proof and that it was up to the jury to determine what significance and weight to give to any evidence.

The trial court agreed with the prosecution and refused to give the jury an instruction on third party culpability in any form. In doing so, the court noted that there was no such standard instruction in either CALCRIM or CALJIC. Though the court made clear that defendant could make the argument that Mercedes and not defendant solicited Pamela's murder, it pointed out that the jury "didn't hear any evidence that Mary Mercedes induced Jose Moya at all to commit this crime. There was no evidence of that." Defendant, however, countered that records showed that Mercedes had called Moya shortly before Pamela was killed and that the rental car used by Moya, Simmons, and Marques to allegedly commit the murder was rented for and used by Mercedes's son.

On appeal, defendant argues there was sufficient evidence to support a third party culpability instruction. He maintains that the trial court erroneously refused to give the instruction because it was not enumerated in CALJIC or CALCRIM. Defendant points out that the parties had stipulated that third party culpability evidence was admissible.

As noted, the trial court *did* admit defendant's evidence of third party culpability. Based on this evidence, defense counsel in closing argument emphasized Patty Taboga's "credible" testimony that Mercedes had asked if Taboga's husband would kill Pamela. Counsel told the jury: "Now you heard Mary had motive. Mary had opportunity. Mary had intent." She was "totally embedded and totally vested in the success or failure of Goldfinger."

Even though the trial court ruled the evidence was admissible, it was not required to give defendant's proposed special instruction on third party culpability. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 500 [pinpoint instruction not required if argumentative, duplicative, or not supported by substantial evidence].) As the trial court concluded, defendant's special instruction as originally drafted was argumentative and improper. (*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [argumentative instruction invited jury to draw inferences favorable to defendant from specified evidence on disputed question of fact].) The court's reasoning for refusing the instruction, contrary to defendant's suggestion, was not based primarily on the lack of a standard instruction in CALJIC or CALCRIM. Finally, "because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof," the failure to instruct on third party culpability was not prejudicial. (*People v. Hartsch*, *supra*, 49 Cal.4th at p. 504)

### b. *Termination of Liability of Aider and Abettor*

At defendant's request and over the prosecution's objection, the trial court instructed the jury on CALJIC No. 3.03

("Termination of Liability of Aider and Abettor"). The instruction provided, in part, that to withdraw from participation of a crime and avoid liability as an aider and abettor, a defendant "must do everything in his power to prevent" the crime's commission.

In closing argument, defense counsel pointed out that before Pamela was murdered, defendant had repeatedly demanded Moya give back the $25,000 defendant had already paid him after Moya missed four previous opportunities to kill Pamela, i.e., "four clean hits" defendant admitted that he had "set up." The prosecution countered that under CALJIC No. 3.03, defendant "has to do *everything in his power, everything in his power, everything in his power* to prevent the commission of the murder. So let's look at what Mr. Fayed did to prevent the murder. Nothing. He didn't do anything. Not a darn thing."

On appeal, defendant argues that CALJIC No. 3.03 erroneously stated that a defendant must do "everything in his power" to withdraw as an aider and abettor in the crime, rather than requiring a defendant to do what was "practicable" or "reasonable," as suggested in the corresponding CALCRIM instruction. (See CALCRIM No. 401 [defendant must do "everything *reasonably within his or her power* to prevent the crime from being committed" (italics added)].) Defendant points out that in 2005, the Judicial Council endorsed CALCRIM and urged courts to use CALCRIM instead of CALJIC. The Attorney General counters that defendant forfeited the argument by failing to object that CALJIC No. 3.03 misstated the law.

Even assuming that defendant did not forfeit the claim that CALJIC No. 3.03 misstates the law, his claim lacks merit. In 2008, three years after the Judicial Council's adoption and

endorsement of CALCRIM, this court explained that CALJIC No. 3.03 "is a correct statement of the law." (*People v. Richardson* (2008) 43 Cal.4th 959, 1022; see *People v. Lucas* (2014) 60 Cal.4th 153, 294.) Further, even under CALCRIM No. 401 (defendant must do "everything *reasonably* within his . . . power"), defendant does not assert, nor is there anything in the record to suggest, that defendant did *anything*—apart from demanding his money back from Moya—to stop the commission of Pamela's murder. Thus, his withdrawal claim would fail under either standard. Even assuming instructional error, defendant fails to show prejudice. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 495 [instructional error is harmless when, beyond a reasonable doubt, it did not contribute to the verdict].)

On a related point, defendant underscores that while the trial court used this CALJIC instruction for aiding and abetting, it used CALCRIM No. 521 for first degree murder. He argues that the intermingling of CALJIC and CALCRIM instructions on this issue was improper. We conclude defendant forfeited this claim by failing to object on this ground and that the claim in any event lacks merit. (*People v. Beltran* (2013) 56 Cal.4th 935, 944, fn. 6 ["trial court may modify any proposed instruction to meet the needs of a specific trial, so long as the instruction given properly states the law and does not create confusion"].)

### c. *Withdrawal from Conspiracy*

On the charge of conspiracy to commit murder, the trial court instructed the jury on seven overt acts allegedly committed for the purpose of furthering the object of Pamela's murder, including defendant's act of paying Moya $25,000 to arrange the murder of Pamela. At defendant's request, the court instructed the jury on CALJIC No. 6.20 (Withdrawal from

Conspiracy), which provides in pertinent part: "In order to effectively withdraw from a conspiracy, there must be an affirmative and good-faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy, he is not thereafter liable for any act of the co-conspirators committed after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member."

On appeal, relying on *People v. Russo* (2001) 25 Cal.4th 1124 (*Russo*), defendant argues that the trial court erroneously failed to instruct the jury that it had to unanimously decide which specific overt act was committed before defendant could no longer withdraw from the conspiracy.

As relevant here, a "jury need not agree on a specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy." (*Russo, supra,* 25 Cal.4th at p. 1128.) In *Russo,* we raised the possibility that "some form of a unanimity instruction" may be necessary if there was evidence that a defendant had withdrawn from the conspiracy. (*Id.* at p. 1136, fn. 2.) In that instance, "the court might have to require the jury to agree an overt act was committed before the withdrawal." (*Ibid.*) We declined to address the question because no such circumstance existed in the case. (*Ibid.*)

Defendant's reliance on *Russo* is misplaced. There is no dispute that defendant's alleged withdrawal from the conspiracy occurred after the first overt act took place. By demanding that Moya *return* the $25,000 defendant had already paid him to kill

Pamela—which defendant asserts supports his claim that he withdrew from the conspiracy—defendant effectively concedes that he committed the first overt act, i.e., payment to Moya in furtherance of the conspiracy to commit murder. "[O]nce an overt act has been committed in furtherance of the conspiracy the crime of conspiracy has been completed and no subsequent action by the conspirator can change that." (*People v. Sconce* (1991) 228 Cal.App.3d 693, 702.);

### d. CALJIC No. 2.23

After the jury heard the recorded conversation between defendant and Smith, defendant asked the trial court to instruct the jury on CALJIC No. 2.23 with respect to Smith. This instruction, which concerns the believability of a witness convicted of a felony, provides in part that the jury may consider "[t]he fact that a witness has been convicted of a felony" as "one of the circumstances . . . in weighing the testimony of that witness." The trial court told defense counsel he could still make his argument but refused to give CALJIC No. 2.23 because Smith "did not testify as a witness." Defendant requested the same instruction at the penalty phase, and the court again refused. On appeal, defendant argues that the trial court applied an unduly narrow definition of "witness" and that the prosecution effectively treated Smith as a witness because it purportedly sought to bolster and vouch for Smith's credibility.

As previously discussed (see *ante*, at p. 24), the prosecution did not improperly vouch for Smith's credibility, and we reject defendant's claim in this regard. Resolution of this issue, however, does not depend on the meaning of a "witness" and whether that term refers only to individuals who testify at trial. As a general matter, declarants whose hearsay

statements are admitted but do *not* testify at trial may be subject to impeachment. (See Evid. Code, § 1202 ["Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing"].) Though this court has not addressed whether Evidence Code section 1202 permits admission of prior felony convictions to impeach the hearsay statements of a nontestifying declarant, we noted that lower courts have held that such evidence "falls within the purview of that provision." (*People v. Brooks* (2017) 3 Cal.5th 1, 52 [citing cases].)

This line of cases does not help defendant, in any event. A declarant's credibility is " 'important only if the prosecution was using his statement to prove the truth of its contents—in other words, his credibility mattered only if his statement was in fact inadmissible hearsay.' " (*People v. Hopson* (2017) 3 Cal.5th 424, 434; see *People v. Curl* (2009) 46 Cal.4th 339, 361-362.) As we have explained, Smith's statements were clearly nonhearsay; they were not offered for the truth of the matter stated. Moreover, we cannot see how defendant could have been prejudiced without this jury instruction—both defense counsel and the prosecution told the jury that Smith was a convicted felon. (See *People v. Smith* (2018) 4 Cal.5th 1134, 1171.)

### e. *CALJIC No. 2.06*

Over defense counsel's objection, the trial court instructed the jury with CALJIC No. 2.06, which permitted the jury to consider whether defendant attempted to suppress evidence, i.e., wanting to kill Moya as a witness, as "a circumstance tending to show consciousness of guilt." In closing argument, the prosecution argued that defendant wanted to kill Moya to

"tie up those loose ends" and "to avoid sitting in this chair for the murder of his wife." On appeal, defendant argues that CALJIC No. 2.06 was unnecessary and prejudicial to the defense because the trial court already instructed the jury on circumstantial evidence. (CALJIC Nos. 2.00, 2.02.) We have repeatedly rejected the claim that CALJIC No. 2.06 is repetitive of other jury instructions on circumstantial evidence. (*People v. Friend* (2009) 47 Cal.4th 1, 52-53.) We do so again here.

### 4. *Violations of Defendant's Fourth Amendment Right To Be Free from Search and Seizure*

Defendant made various pretrial motions to suppress evidence seized during several searches. He unsuccessfully argued that his Fourth Amendment right was violated based on (1) the warrantless search and seizure of his cell phone, (2) the issuance of a search warrant based on an intercepted telephone conversation between defendant's investigator and Moya, and (3) the issuance of a search warrant of defendant's property (including his laptop computer) without probable cause. Contending that the trial court erred in refusing to suppress the evidence, defendant repeats those claims on appeal. We discuss each in turn.

"The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 365.) A warrantless search is per se unreasonable. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219.) "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403.) One such exception, as relevant here, is a search incident to arrest. (*United States v. Robinson* (1973) 414 U.S. 218, 224.)

Another exception, also relevant here, is the inevitable discovery exception. (*Nix v. Williams* (1984) 467 U.S. 431, 440-450; *People v. Robles* (2000) 23 Cal.4th 789, 800-801.)

Section 1538.5 provides a defendant the "sole and exclusive" means before trial to suppress evidence obtained as a result of a search or seizure. (§ 1538.5, subd. (m); see *People v. Williams* (1999) 20 Cal.4th 119, 127.) "[D]efendants have the burden of (1) asserting the search or seizure was without a warrant, and (2) explaining why it was unreasonable under the circumstances." (*Williams*, at p. 129.) However, the burden is on the prosecution to prove evidence seized during a warrantless search falls within a recognized exception. (See *People v. Willis* (2002) 28 Cal.4th 22, 36; *Williams*, at p. 136.) Thereafter, a defendant can respond by pointing out any inadequacies in that justification for warrantless search. (*Williams*, at p. 136.)

### a. *Patdown Search of Defendant and Search Incident to Arrest for Data on the Cell Phone*

On July 29, 2008, the day after Pamela was killed, defendant called the Ventura County Sheriff's Office to request a welfare check on his nine-year-old daughter, J.F., who lived with Pamela in Camarillo. Earlier that morning, an LAPD detective had gone to the Camarillo residence to tell Pamela's daughters of their mother's death. After receiving word that defendant was heading over to the Ventura County Sheriff's Office with his attorneys, the detective met defendant there. He told defendant that he was under arrest for Pamela's murder and that he would be transported to the LAPD West Los Angeles Station. Officers searched defendant incident to arrest and took his Motorola cell phone, which they placed in the front seat of the vehicle. They handcuffed defendant and placed him in the backseat.

The LAPD detective drove defendant some 45 miles from Camarillo to the West Los Angeles Police Station. At the station, defendant invoked his right to remain silent and refused to speak to investigators. An LAPD officer testified that he obtained and possessed defendant's cell phone for an hour and that he "manipulated" the phone to find the number associated with the phone before handing the cell phone to an FBI agent. Defendant was released two hours later without his Motorola cell phone. Officers returned the cell phone the following Friday when they were serving a search warrant at defendant's home.

On October 9, 2009, in addition to other defense motions discussed below, defendant filed a pretrial motion under section 1538.5 to suppress, arguing the evidence was seized from the illegal search of his Motorola cell phone on July 29, 2008. The pretrial hearing on the suppression motion took place on June 10, 2010. The trial court agreed with the prosecution that the only information officers took from that cell phone was the number itself. With this cell phone number, the LAPD in conjunction with the FBI Fugitive Task Force, sought and obtained a court order authorizing the use and installation of wiretap devices for the "Subject Telephone Number."

After hearing testimony from LAPD detectives, the trial court concluded the search of the cell phone was "illegal," even if it was incident to a valid arrest. However, it agreed with the prosecution that because there were different sources from which to discover defendant's cell phone number, including Pamela's contacts in her cell phone, the evidence was admissible based on the inevitable discovery doctrine.

On appeal, defendant makes a number of corollary claims challenging the search and his arrest on July 29, 2008.[7] Ultimately, the Attorney General concedes that the trial court was likely correct that the search of defendant's Motorola cell phone was unlawful. (See *Riley v. California* (2014) 573 U.S. 373, 387 ["[o]nce an officer has secured a phone and eliminated any potential physical threats . . . data on the phone can endanger no one"].) Nevertheless, as the Attorney General underscores, even if the search or arrest, or both, were unlawful, the evidence may nevertheless be admissible under the exception of inevitable discovery. (See *Nix v. Williams*, *supra*, 467 U.S. 431; *People v. Robles*, *supra*, 23 Cal.4th at pp. 800-801.)

"Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. As the United States Supreme Court has explained, the doctrine 'is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' (*Murray v. United States* (1988) 487 U.S. 533, 539 [108 S.Ct. 2529, 2534, 101 L.Ed.2d 472].) The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that would have been obtained without

---

[7] For example, he contends that police investigative reports actually classified defendant as being detained, not arrested, and that authorities conducted an unlawful patdown at the Ventura County Sheriff's Station because there was no indication that defendant was armed and dangerous. It is unnecessary to discuss these claims relating specifically to the underlying search and seizure because we conclude that the inevitable discovery doctrine applies.

police misconduct." (*People v. Robles*, *supra*, 23 Cal.4th at p. 800; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 62 [rule ensures prosecution "is not placed in a better position" absent the illegality but "does not require it be put in a worse one"].)

The inevitable discovery rule "applies only to evidence obtained as the indirect product, or fruit, of other evidence illegally seized." (*Hernandez v. Superior Court* (1980) 110 Cal.App.3d 355, 361.) The prosecution must prove "by a preponderance of the evidence that the information inevitably would have been discovered by lawful means." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 62; *People v. Superior Court* (*Tunch*) (1978) 80 Cal.App.3d 665, 681 ["The test is not one of certainty, but rather of a reasonably strong probability"].) "As this is essentially a question of fact, we must uphold the trial court's determination if supported by substantial evidence." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1040.)

At the suppression hearing, the prosecution presented evidence that shortly after police recovered Pamela's cell phone at the crime scene, they accessed the phone's list of contacts, which included the cell phone number for defendant. The police also "obtained independently" defendant's cell phone number from a search of Moya's cell phone. Moreover, the search of Goldfinger's office led to defendant's cell phone number. In light of these other sources leading to the discovery of defendant's cell phone number, we conclude that substantial evidence supports the trial court's finding that the inevitable discovery rule applied and that the evidence of defendant's cell phone number was admissible. (See *People v. Carpenter*, *supra*, 21 Cal.4th at p. 1040.)

### b. *Motion to Quash Search Warrant Dated July 31, 2008*

On July 29, 2008, Detective Spear sought and obtained a warrant to search the premises at the Happy Camp Ranch. In the supporting affidavit, Detective Spear stated that his review of the video surveillance of the parking lot where Pamela was killed showed the alleged suspects fleeing in a red SUV rented by Goldfinger. The affidavit further explained that a suspect had left footprints at the crime scene, which would have been transferred to the vehicle. Detective Spear averred he believed the vehicle was at defendant's residence.

Detectives executed the search warrant on July 29, and found two locked safes that defendant refused to open. On July 30, after locating the red SUV at the Avis Rent A Car location, detectives searched and gathered evidence from the vehicle. Defendant did not seek to suppress evidence seized on either July 29 or July 30. On July 31, Detective Spear sought another warrant to search the premises at the Happy Camp Ranch. The supporting affidavit "incorporated . . . the entirety of" the July 29 search warrant. It also included an "amendment," adding "personal computers, laptop computers, hard drives, electronic equipment used to store files or written documentation, thumb drives, locked safes, secured lock boxes, authorization of forced entry into locked safes, financial records, soil samples from outside the residence," among the items to be collected. The amendment also sought "samples of saliva from James Fayed for comparison of evidence collected during the investigation."

To justify the search for these additional items, the amendment explained that during an interview with Pamela's adult daughter, Desiree, she revealed that "her mother kept records and documentation that incriminates James Fayed on

48

her personal computer. Desiree [] advised that the computers that her mother used are in her father's residence and contain valuable information." Detectives obtained a search warrant on July 31, which was executed on that day. During the search, authorities seized several laptop computers, over $1 million worth of gold bars, and numerous computer thumb drives. They also found $24,980 in cash wrapped in plastic in defendant's dresser drawer and another $36,000 in cash in a locked metal briefcase located in defendant's closet.

Defendant moved to quash the warrant, and suppress evidence seized during the search. He alleged that there was no probable cause to issue the warrant and that the warrant was insufficient on its face. For instance, Desiree's statement that there was incriminating evidence on Pamela's personal computer was conclusory and "not supported by a single fact in the affidavit." Also, the warrant was overbroad because while the incriminating evidence was purportedly on Pamela's laptop computer, the list of search items effectively allowed officers to "search for anything—anywhere, with no specificity." Further, because detectives had located and searched the red SUV the day before, there was no longer a need to search the premises for the vehicle. Finally, the affidavit on the second warrant contained no facts to support that *new* evidence had materialized *after* the first search; thus, the information in the initial affidavit was too "stale" to justify the second search.

The trial court denied defendant's motion to quash. It found probable cause for the issuance of the warrant. The court further found that, even if there was no probable cause, the officers acted in good faith by obtaining a warrant signed by a magistrate before conducting the search. For reasons that

follow, we conclude that the trial court did not err in denying defendant's motion to quash.

When reviewing issues relating to the suppression of evidence derived from governmental searches and seizures, we defer to the court's factual findings, express or implied, where supported by substantial evidence. (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212.) To determine whether, based on the facts so found, a search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*Macabeo, at p. 1212*.) We conclude that based on the totality of the circumstances, the trial court correctly found probable cause for the issuance of the July 31 search warrant. (See *Illinois v. Gates* (1983) 462 U.S. 213, 230.)

First, defendant's challenge to Desiree's statement on the ground it was conclusory and lacking factual support to justify probable cause is meritless. As the trial court found, Desiree was presumptively reliable as a "citizen informant." (See *People v. Hill* (1974) 12 Cal.3d 731, 757.) Given her relationship to Pamela and defendant, which was clearly set out in the affidavit, Desiree would naturally be knowledgeable about Pamela's activities and would be aware that Pamela and defendant were going through a contentious divorce.

As the affidavit explained, Desiree told investigators that her mother kept documentation "on her personal computer" and she stated that "computers that her mother used are in her father's residence." Whether Pamela used one or several computers in defendant's residence, it was reasonable to describe the items in "generic terms," thus subjecting them to a "blanket seizure." (*U.S. v. Lacy* (9th Cir. 1997) 119 F.3d 742, 746; see *U.S. v. Kimbrough* (5th Cir. 1995) 69 F.3d 723, 727

["generic language is permissible if it particularizes the *types* of items to be seized"].) Contrary to defendant's claim, the search warrant was not overbroad because it listed "personal computers" and "laptop computers" as search items and did not limit it specifically to *Pamela's* laptop computer. Authorities had no way of knowing which computer, or how many for that matter, belonged to Pamela, or which ones she may have used. It was acceptable for the search warrant to include such generic terms to describe the items. (*U.S. v. Lacy*, at p. 746.)

Further, defendant's related claim that the July warrant was "moot" because the red SUV was already located and searched is likewise meritless. After locating the SUV, there was arguably more, not less, reason to search defendant's residence because evidence began tying defendant to the murder, i.e., the recovered vehicle connected to the murder had been rented by defendant's company, Goldfinger. The supporting affidavit expressly noted that authorities had collected physical evidence from it. Armed with new physical evidence from the SUV, authorities sought soil samples outside the residence and samples of defendant's saliva "for a comparison of evidence collected during the investigation." Though just beginning, the investigation was intensifying as each day passed.

Moreover, the July 31 warrant was not based solely on obtaining evidence related to the vehicle used in the murder. The warrant also sought Pamela's computers that Desiree averred were in defendant's residence. It further sought to recover evidence from two locked safes that defendant refused to open during the July 29 search. Rather than seizing the safes first and asking for a warrant later, detectives followed proper

procedure by first obtaining a magistrate's determination of probable cause.

Similarly, defendant's argument that the information in the initial affidavit became stale because authorities failed to seize items during the first search is without legal or factual support. (See *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 370 [whether warrant establishes "it is substantially probable the evidence sought will *still* be at the location at the time of the search"].) In this case, Pamela was killed on July 28, 2008. The following day, detectives obtained the first warrant to search the premises on defendant's Moorpark ranch. The day after that, on July 30, detectives located the red SUV, and recovered physical evidence from the vehicle. In the brief three-day period between the crime and the second search on July 31, it is substantially probable that evidence would still be located at defendant's premises. (*Ibid.*)

Based on the foregoing, we reject defendant's claim that the trial court erroneously denied defendant's motion to quash the July 31 search warrant.

### c. *Admission of Evidence Derived from Recording of Defense Investigator's Questioning of Witness*

Early in the murder investigation, LAPD detectives applied for court-authorized wiretaps targeting the residential "hardline" (or landline) telephone and two cell phones used by defendant's sister, Mary Mercedes, and a residential hardline telephone used by codefendant Jose Moya. A magistrate approved two wiretap applications on August 15, 2008 and August 22, 2008, respectively, and granted one extension on September 13, 2008.

As statutorily required, authorities provided the court several six-day reports containing summaries of some intercepted calls and updates on the investigation. On August 29, 2008, authorities intercepted a call Moya made from his hardline telephone to defense investigator Glen LaPalme. During the 19-minute telephone conversation, the two went over telephone records detailing calls that Moya had made and received on his cell phone. Moya had previously told detectives he reported the cell phone lost or stolen the day after Pamela's murder. When Moya admitted to LaPalme he could not remember exactly when he lost the cell phone, LaPalme suggested: "Now if you lost, I mean if you lost the phone, like, over that weekend before all this shit hit the fan then at least we would, maybe it was somebody else that had the phone, you know what I'm saying?"

Later in the call, LaPalme told Moya he had "no doubt in my mind that [the LAPD] have the vehicle, the SUV, and they're probably doing all sorts of forensic examinations for hair, skin, all that crap, and of course there were people who were using it so you're going to find everybody's hair and skin there." Moya replied, "Except for Pam." When LaPalme indicated he did not hear what Moya had said, Moya told him: "No, except for Pam's, it wouldn't be in there, it shouldn't be in there."

On or about September 10, 2008, Detective Abdul sought a warrant to search Moya's residence at the Happy Camp Ranch in Moorpark. In the supporting affidavit, Detective Abdul recounted the intercepted call on August 29 and opined that Moya's statement that evidence of Pam's skin and hair should not be in the SUV, "[t]his statement in itself proves Moya has knowledge of the murder." Detective Abdul averred that he "believes evidence will be recovered from Moya's residence that

will link him to the murder of Pamela Fayed." On September 10, a magistrate approved the warrant to search the Happy Camp Ranch. The list of items to be searched included "[u]nknown type sharp objects . . . consistent with the injuries sustained by Pamela Fayed," cell phones, and Moya's bank records and deposit slips. During the search, authorities recovered three cell phones, which defendant later described as evidence "crucial to the government's theory of the case."

Before trial, on October 9, 2009, defendant filed a motion to traverse the affidavit, a motion to suppress the evidence obtained in violation of wiretap provisions, and a motion to dismiss for violation of due process. Defendant argued that the LAPD was well aware that LaPalme was a private investigator working for the defense and yet continued to record the call between him and Moya. Because LaPalme was conducting witness interviews for the defense, defendant argued the conversation between LaPalme and Moya was protected under the work product doctrine. Thus, the affidavit's failure to disclose that LaPalme was a defense investigator was an egregious omission, one that hindered the "crucial, inference-drawing powers of the magistrate." (*People v. Kurland* (1980) 28 Cal.3d 376, 384.)

The trial court denied defendant's motions. It rejected defendant's argument that the attorney work product doctrine protected the intercepted conversation between LaPalme and Moya. Moreover, it found "ample probable cause" to support the search warrant even if the challenged information were not included. The court also agreed with the prosecution that there was no material omission in the affidavit to the magistrate. On appeal, defendant raises similar arguments as below. He claims that LaPalme and Moya's conversation was protected under the

work product doctrine and that it should be considered excised from the affidavit.

Even assuming the intercepted call was privileged and should be deemed omitted from the affidavit, we conclude the affidavit's remaining contents supported probable cause. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1297 (*Bradford*).) In general, statements contained in an affidavit of probable cause that are proven to be false or reckless by a preponderance of the evidence, should be considered excised from the affidavit. (*Ibid.*) As relevant here, "[i]f the remaining contents of the affidavit are insufficient to establish probable cause, the warrant must be voided and any evidence seized pursuant to that warrant must be suppressed. [Citation.] [¶] A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause. [Citations.] 'Pursuant to [California Constitution, article I,] section 28 [, subdivision] (d), materiality is evaluated by the test of *Illinois v. Gates*[, *supra*,] 462 U.S. 213, . . . which looks to the totality of the circumstances in determining whether a warrant affidavit establishes good cause for a search." (*Bradford*, *supra*, 15 Cal.4th at p. 1297.)

In this case, even without considering LaPalme and Moya's conversation, the affidavit's remaining contents provided probable cause for issuance of the warrant. The affidavit included evidence that Moya had access (both before and after the murder) to the red SUV seen leaving the murder scene, statements from defendant's employee who told detectives Moya was not at the ranch at the time of Pamela's death, and statements from another employee that said defendant directed him to give Moya $24,000 sometime in mid-

July (several weeks before the murder).  Based on the totality of the circumstances, the trial court properly concluded the affidavit established probable cause to support the search warrant.  (*Bradford*, *supra*, 15 Cal.4th at p. 1297.)

### 5.  *Evidentiary Rulings*

A trial court has broad discretion to admit or exclude evidence.  We will not disturb its ruling unless there is a showing the court abused this discretion by acting in an arbitrary, capricious, or patently absurd manner resulting in a miscarriage of justice.  (*People v. Vieira*, *supra*, 35 Cal.4th at p. 292.)  Unless a defendant elaborates or provides a separate argument for related constitutional claims, we have declined to address any boilerplate contentions.  (*People v. Mills* (2010) 48 Cal.4th 158, 194 [" 'The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights" ' "].)

On appeal, defendant challenges a number of evidentiary rulings the trial court made.  We discuss each in turn.

### a.  *Admission of Government Evidence*

#### (1) *Evidence of federal indictment against defendant*

Before trial, defendant filed an in limine motion to exclude evidence of the February 26, 2008, federal indictment against him for operating an unlicensed money transmitting business (18 U.S.C. § 1960), an indictment which was originally filed under seal.  Defendant sought to specifically exclude any reference to him as a terrorist, which was purportedly included in an LAPD summary report and later shared with the FBI.  The terrorist reference was not included in the one-sentence federal indictment.  The federal government later dismissed the indictment on September 15, 2008, the same day the prosecution

filed a complaint against defendant and Moya for Pamela's murder.

Defendant's in limine motion alleged that any evidence of uncharged conduct underlying the federal indictment constituted inadmissible character evidence (Evid. Code, § 1101, subd. (d)) and was not otherwise admissible to prove motive, common plan, or identity. (See *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 393.) Because it was undisputed that the federal indictment remained sealed until after Pamela's murder, defendant argues that it could *not* have provided a motive to kill Pamela to prevent her from cooperating with federal authorities.

The trial court denied defendant's in limine motion to exclude evidence of the federal indictment and investigation. It concluded such evidence was relevant to defendant's motive to kill Pamela. It further rejected defendant's claim of prejudice under Evidence Code section 352, noting that the federal indictment "pales in comparison" to the murder for hire conspiracy charge and suggested that a limiting instruction would address defendant's concerns.

Focusing on the "lack of similarity of motive or direct connection" between the money licensing violation and the murder charge, defendant argues that evidence of the dismissed federal indictment constituted inadmissible character evidence. (See Evid. Code, § 1101, subd. (a).) He maintains that the prosecution failed to show that Pamela agreed to cooperate with federal authorities (and that defendant knew Pamela intended to cooperate), which the prosecution argued provided defendant's motive to kill Pamela. For reasons that follow, we deny defendant's evidentiary claim.

Though inadmissible to prove a defendant's criminal propensity, evidence of a defendant's prior uncharged misconduct is admissible if relevant to prove a material fact at issue in the case, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." (Evid. Code, § 1101, subd. (b).) "In general, we have explained that '[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 783.) As pertinent here, "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.) It is enough that the " 'motive for the charged crime arises simply from the commission of the prior offense.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1115 [evidence of wife's financial fraud relevant to show motive for killing her husband].)

Here, the federal indictment was a key piece of evidence that helped explain the development of defendant's motive to kill Pamela. Along with the indictment, the investigation related important details of events leading up to Pamela's murder. The prosecution first described Pamela becoming worried about Goldfinger's future in light of the federal investigation. Despite defendant's fierce opposition, she sought to obtain a money transmitting license and withdrew at least $400,000 from the company's account. The prosecution explained how defendant was furious at Pamela for taking the money, trying to secure a money transmitting license despite

defendant's insistence that they did not need it, and giving federal authorities a reason to closely scrutinize Goldfinger. After filing for divorce, defendant banned Pamela from Goldfinger, alleging that she had embezzled money from the company. Finally, in an e-mail defendant had sent to his friend, Melanie Jackman, complaining about Pamela, he wrote: "I have been letting her get away with this shit for years, and enough is enough."

The prosecution's theory on why defendant killed Pamela, in short, was not based simply on her possible cooperation with federal authorities; rather, defendant's increasing animosity and bitterness towards Pamela came to a head when Pamela's actions threatened to upend their highly profitable business. The circumstantial evidence, as the prosecution underscored, was "overwhelming."

Furthermore, whether there was evidence of an actual agreement that Pamela would cooperate with the federal authorities or whether Pamela and defendant knew about the federal indictment itself are both beside the point. Defense counsel conceded that defendant and Pamela both were aware that federal authorities were investigating Goldfinger. And while there was no evidence that Pamela had an agreement she would testify against defendant, the prosecution argued that defendant killed Pamela "to *prevent* her from making an agreement, to prevent her from doing that. That's our point."

Moreover, the record reveals evidence that Pamela at least intended to cooperate with federal authorities. Evidence further suggested that defendant was at least suspicious, if he did not actually know, of Pamela possibly incriminating him in the federal case. " '[T]o be admissible, evidence need not absolutely

confirm anything. It is axiomatic that its weight is for the jury.' " (*People v. Peggese* (1980) 102 Cal.App.3d 415, 420.) Finally, as a practical matter, because the jury heard defendant's recorded jailhouse conversation with Smith, some mention of the federal indictment was required to explain why defendant was in federal custody in the first place.

We conclude that the probative value of evidence of the dismissed federal indictment and related investigation outweighed any prejudice from admitting the evidence. Further, the trial court instructed the jury that evidence of uncharged misconduct may only be considered "for the limited purpose of determining, if it tends to show, that the defendant had a motive to commit the charged crimes." (CALJIC No. 2.50.) We presume the jury followed the trial court's instruction absent evidence to the contrary. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821.)

### *(2) Testimony of Carol Neve*

Regarding evidence of Pamela's intent to cooperate with federal authorities on the Goldfinger investigation, the prosecution proffered the testimony of witness Carol Neve, a longtime friend and confidante of Pamela's. After the parties vigorously debated the issue, the trial court prohibited the prosecution from eliciting Neve's testimony that Pamela told Neve she was going to cooperate with the federal authorities. The trial court concluded the prosecution failed to show the link between Pamela's intent to cooperate and defendant's knowledge of that intent, which the trial court described as a "pretty pivotal issue in this case." However, the trial court permitted Neve, who had a similar e-currency business and

spoke to Pamela about it, to testify about Pamela's intent to obtain a money transmitting license for Goldfinger.

Over defendant's hearsay objection, Neve testified that in September or October of 2007, she had advised Pamela that "her company [Goldfinger] was at risk" and told Pamela that she should get "money transmitter licenses," even though such licenses were "very expensive" and had to be obtained through the federal government. The trial court ruled such statements did not constitute hearsay because they were not offered for their truth; rather, Neve's testimony was "what Miss Fayed was advised." Neve also testified that Pamela told her that "her intent was to obtain those money transmitter licenses."

Overruling defendant's hearsay objection, the court concluded that Pamela's hearsay statements were admissible under Evidence Code section 1250, subdivision (a)(2), as a statement of future intent "to prove or explain acts or conduct of the declarant."

On appeal, defendant argues that the trial court erred in allowing Neve's testimony. Defendant again asserts that Neve's statement regarding what she advised Pamela was hearsay. As the trial court concluded, however, Neve's advisement to Pamela was not offered for the truth of the matter stated, i.e., to show that Pamela should have obtained the licenses, but was offered to show Pamela's reaction and conduct in response to the statement. (See Evid. Code, § 1200; *People v. Livingston* (2012) 53 Cal.4th 1145, 1162.)

Likewise, we conclude that Pamela's hearsay statement, i.e., that she told Neve she intended get the money transmitting license for Goldfinger, was admissible as a statement of the declarant's future intent under Evidence Code section 1250,

subdivision (a)(2). Under this provision, "a statement of the declarant's intent to do certain acts is admissible to prove that he did those acts." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code (2004 ed.) foll. § 1250, p. 531; see *People v. Alcalde* (1944) 24 Cal.2d 177, 187-188.) Here, Pamela's statement of future intent to purchase a money transmitting license was admissible to prove that she tried to obtain the license, which in turn was relevant to show why defendant was angry at Pamela and had a motive to kill her. Contrary to defendant's suggestion, the statement was not admitted to prove Pamela's existing state of mind under Evidence Code section 1250, subdivision (a)(1), which expressly requires that the declarant's mental state be "itself an issue in the action." (See *People v. Noguera* (1991) 4 Cal.4th 599, 621.)

### (3) Recorded conversation of Mary Mercedes

As previously noted, the defense intended to call Mary Mercedes as a witness to question her on whether she attempted to solicit Taboga's husband to kill Pamela Fayed. Though there was some uncertainty whether the prosecution would offer Mercedes immunity in exchange for her testimony, Mercedes ultimately invoked her Fifth Amendment privilege against self-incrimination, and the court declared her unavailable as a witness. Based on Mercedes's unavailability, the trial court permitted the defense to elicit hearsay testimony from Taboga that Mercedes had offered to pay Taboga's husband, Kurt, $200,000 to kill Pamela. (See Evid. Code, § 1230.)

After Taboga's direct testimony, the prosecution informed the trial court it intended to introduce the out-of-court statement of Mercedes pursuant to Evidence Code section 1202. In a recorded conference call between Mercedes, Detective

Abdul, and Prosecutor Jackson, Mercedes denied Taboga's allegations. This telephone conversation took place on March 30, 2011, a month before Mercedes had asserted her Fifth Amendment privilege.

Defense counsel objected, arguing in part that the prosecution "sprung" this evidence at the last minute and that they had not been given proper notice. The trial court, however, explained that "this is impeachment testimony, so they don't have to give it to you in advance." Defendant also claimed "fundamental unfairness" in being unable to cross-examine a witness whom, he asserted, the prosecution could have given immunity to prevent her unavailability. Rejecting defendant's contention, the trial court found the tape admissible for purposes of impeachment. After substantially redacting the statement with input from both sides, the trial court admitted Mercedes's statement into evidence.

On appeal, defendant argues that even though this statement was used as impeachment evidence against Taboga, the prosecution sought admission of the tape itself as opposed to just using information on the tape; thus, defendant asserts, the tape constituted "real evidence" subject to timely disclosure under section 1054.1, subdivision (c). (See *People v. Tillis* (1998) 18 Cal.4th 284, 292-293; § 1054.7 [disclosure 30 days prior to trial generally required absent good cause].) Defendant maintains the trial court should have prohibited the tape's admission as an authorized sanction under section 1054.5, subdivision (b). Even assuming that the tape constituted "real evidence" under section 1054.1, subdivision (c) that the prosecution thereby committed a discovery violation for failing to timely disclose it, and finally, that the trial court should have prohibited the presentation of this tape as a sanction, any error

was harmless.  (See *People v. Verdugo* (2010) 50 Cal.4th 263, 280.)

Describing Taboga as his "star witness," defendant argues that because the prosecution delayed disclosure of this tape, it "was able to launch a devastating counterattack at the end of trial," one that "gutted" their defense.  Defendant overstates his case.  As noted, Taboga came forward with the information about Mercedes a month before trial began, even though her telephone conversation with Mercedes took place three years earlier in May 2008, several months before Pamela was murdered.  As Taboga testified, she did not believe she had information that "could free" defendant but wanted to get "the information out because it needs to be heard."  On cross-examination, the prosecution pointedly questioned Taboga why she never told anyone about Mercedes's purported solicitation to kill Pamela.  Taboga explained that she did tell Pamela to "just watch herself and be careful" but admitted she never told Pamela about her conversation with Mercedes.

Making only a brief reference to Mercedes's denial in closing argument, the prosecution thoroughly discredited Taboga's testimony, criticizing it as nonsensical and implausible.  We find that any improper admission of Mercedes's taped statement to impeach statements Taboga attributed to Mercedes to be harmless.  Based on the overwhelming evidence of defendant's guilt and in light of the discredited, implausible testimony of Taboga, we conclude beyond a reasonable doubt that the error, if any, in allowing such impeachment, did not contribute to the verdict.  (See *People v. Pokovich* (2006) 39 Cal.4th 1240, 1255.)

### (4) Pamela's bloody clothes, eyeglasses, and purse

During the direct testimony of LAPD Detective Eric Spear, the prosecution displayed photographs of the crime scene, including a picture of Pamela's bloody shirt and pants. Based on the amount of blood at the crime scene, Detective Spear opined it was a "violent attack, and just brutal." He further concluded that because Pamela's purse, wallet and money were still at the crime scene, it was not a robbery. The prosecution asked Detective Spear to show the actual shirt Pamela was wearing when she was killed, which he described as a shirt "which was white at one time that is obviously soaked in blood." Detective Spear also showed the pair of pants Pamela was wearing at that time.

Objecting under Evidence Code section 352, defense counsel pointed out there was no dispute that Pamela was stabbed to death and offered to stipulate that the bloody items belonged to Pamela, so that the prosecution would not "parade one bloody item after another." He also maintained the evidence was cumulative and served only to inflame and prejudice the jury. The prosecution countered that the manner in which Pamela was killed was significant and showing the jury the actual blood-soaked items instead of pictures of them would "mak[e] the viciousness of the murder, premeditation, the deliberation, the intent to kill much more real to the jury by way of three or four minutes of testimony." The trial court permitted the prosecution to demonstrate the remaining two items to the jury—Pamela's eyeglasses and purse—during Detective Spear's testimony.

On appeal, defendant argues that the *photographs* of these bloody items were more prejudicial than probative under

Evidence Code section 352 because they were superfluous and served no purpose but to appeal to the jury's emotions. Though the actual blood-stained items were presented in court and introduced into evidence through Detective Spear's testimony, defendant's focus is on the prejudicial effect of the admitted photographs.

" 'As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim' (*People v. Osband* (1996) 13 Cal.4th 622, 675 [55 Cal.Rptr.2d 26, 919 P.2d 640]), and even if it 'duplicate[s] testimony, depict[s] uncontested facts, or trigger[s] an offer to stipulate.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 687.) Here, the prosecution explained that the blood-soaked shirt and pants depicted in the photographs showed the brutality of Pamela's killing, which suggested she was killed by a hitman. We conclude the trial court did not abuse its considerable discretion in admitting the photographs of Pamela's personal effects found at the murder scene. (See *People v. Panah* (2005) 35 Cal.4th 395, 477; *People v. Boyce*, *supra*, 59 Cal.4th at p. 687 [trial court abuses its discretion by acting " 'in an arbitrary, capricious, or patently absurd manner' "].)

### (5) Photographs of Pamela

During the direct examination of Desiree, Pamela's then 21-year-old daughter, the prosecution showed her various family photographs to identify. These included photographs of Desiree, her half-sister, J.F., and Pamela; some photographs of just Desiree and Pamela, photographs with J.F. and Pamela, and a photograph of defendant. At one point, the prosecution asked the trial court whether he could approach Desiree and

show her the photographs (instead of using a projector). Defense counsel replied that he had "no objection. If he wants to just show her, I have no objection." Desiree explained when and where the various pictures were taken, which included Desiree's high school graduation in June 2008, a month before Pamela was killed.

On appeal, defendant for the first time claims the trial court erred in allowing the photographs of Pamela and her daughters into evidence at the guilt phase because the photographs were purportedly irrelevant and superfluous. Defense counsel, however, did not object below but instead stated he had "no objection" to showing Desiree the photographs. We conclude defendant has forfeited the issue.

### b. *Defendant's Cross-examination Rights*

AUSA Aveis testified regarding the federal government's investigation into defendant and Goldfinger. During cross-examination, defense counsel asked Aveis whether defendant had indicated what his defense would be to the federal charge of acting as a money exchanger without the proper licensing. Aveis responded he learned that defendant would be alleging he did not get a license because he did not believe he needed one. Following up on this answer, defense counsel attempted to ask Aveis whether Aveis knew that defendant did not agree that he needed a license to operate Goldfinger and whether this issue was one Aveis anticipated litigating in court. The trial court sustained the prosecution's hearsay objections and struck Aveis's answer at the prosecution's request.

On appeal, defendant for the first time claims that the statements were admissible under Evidence Code section 1250 as circumstantial evidence of defendant's state of mind,

revealing that defendant did not believe that Goldfinger needed a money transmitting license. Defendant explains that evidence of his state of mind was critical to rebut the prosecution's main theory that defendant killed Pamela because he feared she would cooperate in the federal investigation. Defendant purportedly had no reason to worry about the investigation (and therefore, had no reason to kill Pamela) because he had a valid defense to the federal charge and also because he was winding down the business and would no longer need the license.

Defendant further asserts that his inability to ask AUSA Aveis any questions about the strength of the government's case against him violated his constitutional right to confront and cross-examine witnesses, particularly when the prosecution was permitted to ask Carol Neve a similar question concerning Pamela's belief about the necessity of the money transmitting license. The Attorney General counters that defendant forfeited the argument by failing to challenge the trial court's ruling below. Even assuming he did not forfeit the issue by failing to lay the foundation for the admission of Aveis's testimony, we conclude that any error was harmless.

Regardless of the actual strength of the government's case against defendant, there was evidence that defendant generally worried Pamela would implicate him for wrongdoing. Defendant complained to Smith that Pamela "ran her mouth too much" and that she "made all these stupid accusations and ridiculous accusations against me just to try and make me look bad." Further, contrary to defendant's assertion, the prosecution's theory on defendant's motive for killing Pamela was not simply that he wanted to prevent her from cooperating in the federal investigation. As discussed above, the prosecution presented an extended narrative of events leading up to

Pamela's murder in closing argument. After outlining these events, the prosecution underscored: *"And then on top of all that* he finds out that Pamela wants to cooperate with the authorities" and that if she does, "he stood to lose everything."

### c. *Exclusion of Defendant's Evidence*

#### (1) *Defendant's state of mind*

On appeal, defendant argues the trial court erred in sustaining the prosecution's hearsay objections to exclude evidence he maintains was crucial to his defense. For instance, the prosecution questioned Greg Herring, a family law attorney that Pamela had hired to replace another attorney in November 2007, a month or so after defendant had filed for divorce. Herring testified that Pamela was dissatisfied with how the divorce case started off, which included stipulations between defendant and Pamela allowing defendant to control the companies and providing Pamela a modest salary. Herring also testified about the potential assets at stake in the divorce ("either hundreds of millions or maybe even a billion or more"), and his concern that defendant would liquidate assets. He also testified that the divorce proceedings had reached a "fever pitch" shortly before Pamela was murdered.

On cross-examination, defense counsel asked Herring about a letter defendant's divorce attorney, John Foley, had sent Herring about defendant's intention to liquidate the E-bullion and Goldfinger entities. Defense counsel questioned Herring about statements in the letter explaining defendant's "rationale for why he is liquidating" the E-bullion and Goldfinger companies. In response to the prosecution's hearsay objection, defense counsel explained that he would ask Herring "whether the liquidation was motivated in part by a desire to avoid having

to spend the money on buying licenses that Pam was insisting on." The trial court sustained the prosecution's hearsay objection, and defendant did not propose that a hearsay exception applied, nor did he raise the issue again.

On appeal, defendant claims for the first time that this hearsay statement was admissible under the state of mind exception (Evid. Code, § 1250), because it would show that defendant was intending to wind down their e-currency business, purportedly negating various prosecution theories for why defendant killed Pamela. Although defense counsel explained that he intended to question Herring about the letter, he "did not show that the testimony came within an exception to the hearsay rule, and did not attempt, by offer of proof or otherwise, to lay the proper foundation for that exception." (*People v. Livaditis* (1992) 2 Cal.4th 759, 778.)

Even if defendant preserved this claim for review, we conclude that any error in preventing this line of questioning was harmless. Without objection, defense counsel earlier asked Herring what he thought defendant and his divorce attorney were "trying to accomplish" by informing Pamela about their intent to liquidate the E-bullion and Goldfinger entities and whether Herring's "perspective was that he was going to threaten to liquidate the company in order to prevent you from getting Pam Fayed a proper accounting and a proper compensation." Herring replied that he did not know what defendant "was thinking" or what his attorney "was thinking when he sent" the letter to Herring. Thus, any further questioning of Herring on this issue would have likely yielded little information.

### *(2) Third party culpability defense*

During the direct examination of Patty Taboga, defense counsel attempted to question her about whether she spoke to Mary Mercedes about defendant and Pamela's divorce. In response to the prosecution's hearsay objection, defense counsel argued that the exception for statements against penal interest applied because Taboga was going to describe Mercedes "savaging Pam" and would testify to other statements Mercedes made showing her "animus, her intent, motive to kill Pam." The trial court explained that animus towards Pamela was not enough and that Mercedes's statements had to be against her "penal interest." However, the record does not disclose that defendant laid any foundation for admitting this evidence.

On appeal, defendant asserts that these hearsay statements were admissible to prove Mercedes's "state of mind, emotion, or physical sensation." (Evid. Code, § 1250, subd. (a)(1).) The Attorney General maintains that defendant sought admission of the statements only under Evidence Code section 1230 and "invited" any error by limiting himself to this exception. For reasons stated below, we conclude that any error in excluding Mercedes's hearsay statements that she hated Pamela was harmless.

As noted above, the trial court permitted defendant to present a third party culpability defense that Mercedes, and not defendant, solicited the murder of Pamela. Even if statements that Mercedes harbored animus towards Pamela tended to show her motive to kill Pamela, their admission would have made little difference to the success of this defense. As discussed above (see *ante*, at p. 64), the prosecution thoroughly undercut Taboga's testimony about Mercedes's solicitation to kill Pamela,

characterizing it as illogical and unbelievable. The defense itself was not plausible, and the fact that Mercedes may have hated Pamela would have done little to save the defense. Moreover, defendant was not otherwise precluded from presenting this evidence from other sources.

Defendant also points out that based on the prosecution's hearsay objection, the trial court struck Taboga's testimony that when she had asked Mercedes whether defendant knew about this phone call and her request that Taboga's husband kill Pamela, Mercedes had replied, "No." Because defendant did not argue below for the statements' admissibility, he has forfeited any claim that these hearsay statements were admissible under an exception. (See *People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Finally, defendant claims that the trial court erred in excluding any evidence of Taboga's March 9, 2011 letter to defendant, in which she first accused Mercedes of soliciting Pamela's murder back in May 2008. To rebut the prosecution's assertion that Taboga was lying about Mercedes's solicitation, defendant argued the letter was a prior consistent statement under Evidence Code section 1236. (See Evid. Code, § 791.) However, the prosecution countered that it had never questioned what Taboga said in the letter was somehow inconsistent or consistent with her testimony at trial. The trial court excluded the letter as inadmissible hearsay.

The trial court did not err in refusing to admit Taboga's March 9 letter to defendant. Contrary to defendant's contention, it is not sufficient that Taboga's consistent statement simply be made "prior to" her trial testimony. (*People v. Riccardi* (2012) 54 Cal.4th 758, 802.) Rather, the relevant

72

time is "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) Here, Mercedes allegedly asked Taboga in May 2008 if her husband would kill Pamela. Pamela was killed on July 28, 2008, and a complaint charging defendant with Pamela's murder was filed on September 15, 2008. Arguably, Taboga would have had a motive to fabricate Mercedes's solicitation after defendant was charged with Pamela's murder. Rather than writing this letter to defendant before or around that time, Taboga wrote the letter *three years* later. "[I]f the consistent statement was made after the time the improper motive is alleged to have arisen, the logical thrust of the evidence is lost and the statement is inadmissible." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code, *supra*, foll. § 791, p. 501.)

### *(3) Defendant's inability to commit crime*

Before trial, defendant filed an in limine motion requesting that defendant's two doctors be permitted to testify that they had prescribed defendant pain medication and to testify about the medications' likely effects on defendant. Defendant sought to show he "was incapable of plotting a murder and could not have committed the acts that are alleged." The prosecution countered that this evidence constituted evidence of "voluntary intoxication" and that it was only admissible in the guilt phase to show a defendant's diminished capacity. (Former § 22, subd. (c), renumbered as § 29.4, subd. (c) by Stats. 2012, ch. 162, § 120.) Because defense counsel conceded he did not intend to offer this evidence to negate defendant's intent, the trial court excluded the evidence. We conclude the trial court did not err.

### 6. *Insufficient Evidence of Special Circumstance Allegations*

### a. *Insufficient Evidence of Financial Gain*

The jury found true the special circumstance that defendant murdered Pamela for financial gain. (§ 190.2, subds. (a)(1), (c); CALJIC No. 8.81.1.) The prosecution presented two theories supporting this special circumstance allegation. First, it pointed out that defendant would stand to get all—instead of just half—of the marital and business assets if Pamela were killed, rather than if they got divorced. Second, over defense objection, the prosecution also argued that defendant did not have to financially gain from the murder if he hired Moya: "In other words, if you find that Mr. Moya was going to or did gain financially to the tune of $25,000, then that is enough to establish the special circumstance for financial gain."

On appeal, defendant challenges this second theory, arguing that the evidence was insufficient to support the finding on this basis. Distinguishing both *People v. Bigelow* (1984) 37 Cal.3d 731 and *People v. Freeman* (1987) 193 Cal.App.3d 337, on which the prosecution relied, defendant asserts that the prosecution improperly argued it only had to show that Moya received some financial gain; the prosecution was required to, but did not, show that *Moya* was the actual killer. On review, we view the evidence in the light most favorable to the verdicts. (*People v. Johnson* (2016) 62 Cal.4th 600, 630.)

Under section 190.2, subdivision (a)(1), a defendant is subject to the special circumstance if the "murder was intentional and carried out for financial gain." Even if the defendant is "not the actual killer," if that defendant "with the intent to kill, aids, abets, counsels, commands, induces, solicits,

requests, or assists any actor in the commission of murder in the first degree," he or she is also subject to this special circumstance. (§ 190.2, subd. (c).) "Reading the two provisions together it is clear that one who intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment." (*People v. Freeman, supra*, 193 Cal.App.3d at p. 339 [construing 1978 version of § 190.2]; see *People v. Padilla* (1995) 11 Cal.4th 891, 933.) Defendant suggests that evidence of Moya's financial gain is insufficient without evidence that he was the actual killer and not just an intermediary.

*Freeman* did not address a multiparty situation involving the hirer of a contract killer, the actual killer, and someone who acts as intermediary between the two. Thus, contrary to defendant's suggestion, *Freeman* does not stand for the proposition that the actual contract killer, as opposed to an intermediary, must have a financial gain from the murder. Rather, subsequent cases have rejected that interpretation. (*People v. Singer* (1990) 226 Cal.App.3d 23, 44; see *People v. Battle* (2011) 198 Cal.App.4th 50, 82 [following *People v. Singer*].) "[I]t is hard to see why, as a matter of policy, the Legislature would want to differentiate between a murder for hire where there is no intermediary and one where there is. Apart from possible causation problems where the link between the hirer and actual killer is extremely attenuated (not our case), the moral culpability of the hirer would be the same. (*People v. Freeman, supra*, 193 Cal.App.3d 337, 340.) The distinction urged by defendant would tend to snare amateurs while letting practiced killers with impersonal, large networks of thugs off the hook. It hardly makes sense." (*People v. Singer, supra*, 226 Cal.App.3d at p. 44.)

This policy argument articulated in *Singer* has particular relevance here.  When responding to Smith's incredulity at how "this many people" got involved in Pamela's murder, defendant reassured Smith that he had "the insulation, cause I don't know them, and they don't know me.  I never met them.  I never seen them.  I wouldn't recognize him."  The prosecution reiterated that defendant  boasted he was "insulated" because it was Moya who had "subcontract[ed]" with Simmons and Marquez.

In sum, there was sufficient evidence to support the jury's true finding of the financial-gain special-circumstance allegation.

### b.  *Insufficient Evidence of Lying in Wait*

The jury also found true the lying-in-wait special circumstance allegation.  CALJIC No. 8.81.15.1 provides in part that the jury must find: "1. The defendant intentionally killed the victim; and [¶] 2. The murder was committed by means of lying in wait."  In closing argument, the prosecution explained that as to the second element, the question is, "[W]as the murder committed while the defendant or any co-conspirator was lying in wait? Any co-principal, any aider and abettor was lying in wait?  Well, that's the three folks in the parking garage, Simmons, Marquez and Moya.  They were the ones lying in wait."  Defendant did not object to the instruction as given, did not seek to modify the instruction, and did not later object to the prosecution's explanation of the instruction at closing argument.

On appeal, defendant insists that section 190.2, subdivision (a)(15) is ambiguous in terms of who must be lying in wait.  In any event, he argues that allowing an aider and abettor—who specifically intended to kill, but did *not* intend to lie in wait, did not actually lie in wait and did not aid and abet

the lying in wait—to be subject to the lying-in-wait special circumstance violates due process. Defendant asserts that the prosecution's closing argument that evidence that any of the codefendants were lying in wait would support a true finding of the special circumstance allegation was improper. We reject this claim.

To determine whether an aider and abettor who is not the actual killer can be subject to the lying-in-wait special circumstance, "the questions are whether defendant, with the intent to kill, aided and abetted the victim's killing, and whether the actual killer intentionally killed the victim by means of lying in wait." (*People v. Johnson*, *supra*, 62 Cal.4th at p. 630; see *People v. Bonilla* (2007) 41 Cal.4th 313, 331 [interpreting earlier version of 190.2].) The record contains ample evidence that defendant aided and abetted Moya's killing of Pamela by lying in wait. Defendant admitted to Smith that "[t]here were four different other occasions where I had it so it was perfectly clean. Yeah, it was a rural area. I even had the times, dates, everything, location. . . . I physically made sure that it was pre-checked and cleared with, you know—and there's no—no cameras, none. But they pick the day before my fuckin' court hearing at the busiest place in LA." Indeed, when describing a prior missed opportunity for Moya to kill Pamela, defendant essentially admitted that he wanted Moya to kill her by means of lying in wait: "All he had to do was sit there, wait for her to get in the car, and jack it." Contrary to defendant's assertion, defendant's liability was based on his own intent and his own significant actions in masterminding the killing of Pamela.

Based on the foregoing, we conclude the record contains sufficient evidence to support the jury's lying-in-wait special-circumstance finding.

### 7. *Prosecutorial Misconduct at Guilt Phase*

Defendant maintains that the prosecution committed various acts of misconduct at the guilt phase, including mischaracterizing the evidence, misstating the law, making inflammatory remarks, and referring to facts outside the record.

It is prosecutorial misconduct to misstate the law. (*People v. Cortez* (2016) 63 Cal.4th 101, 130.) It is also misconduct to misstate the evidence or go beyond the record. (*People v. Gonzalez* (2011) 51 Cal.4th 894, 947; *People v. Davis* (2005) 36 Cal.4th 510, 550.) However, the prosecution "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom. (*People v. Hamilton* (2009) 45 Cal.4th 863, 928; *People v. Rowland* (1992) 4 Cal.4th 238, 277 ["hyperbolic and tendentious" comments, even if "harsh and unbecoming," may be reasonable if they can be inferred from the evidence].) "A defendant asserting prosecutorial misconduct must . . . establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568); see *People v. Dennis* (1998) 17 Cal.4th 468, 522 ["whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury"]; see also *People v. Osband, supra,* 13 Cal.4th at p. 695 [prosecutor's "remark was gratuitous, but his misconduct was also de minimis"].)

To preserve a claim of prosecutorial misconduct on appeal, " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]' [Citation.] The failure to timely object and request an admonition will be excused if

doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Clark* (2011) 52 Cal.4th 856, 960 (*Clark*); see *People v. Collins* (2010) 49 Cal.4th 175, 226.) We discuss each claim of alleged prosecutorial misconduct in turn.

### a. Closing Argument

During closing argument at the end of the guilt phase, Prosecutor Jackson described Pamela's last moments after she had been stabbed and was still conscious. He next asked: "What do you think she might have been thinking? Those two or three or even four minutes when she had time to think? Time to feel? Time to realize what was happening? She would never again touch the hand of her daughter, never kiss the cheek of [J.F.], never see their smiling faces. And she had time. How long do you think a minute is? She had three or four. While all this is going through her mind, how long do you think that minute lasted? An eternity. Think about what she was going through. And I am going to ask you just to think for one minute, starting now."

At this point, defendant objected, arguing this line of questioning only engendered prejudice that outweighed any probative value. Jackson countered that the circumstances of Pamela's death were relevant to show "the brutality of how she died, the fact that this was a personal execution." The trial court overruled defendant's objection. Afterwards, the prosecution continued and asked the jury again to think for one minute. On appeal, defendant argues that the prosecution improperly asked the jury to view the crime from the perspective of the suffering victim and that the trial court erred in overruling his objection.

"As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.) Though we have permitted such argument at the penalty phase (see *People v. Cowan* (2010) 50 Cal.4th 401, 485-486; *People v. Wash* (1993) 6 Cal.4th 215, 263-264), asking jurors to "imagine the thoughts of the victims in their last seconds of life" is rarely a relevant inquiry at the guilt phase. (*People v. Leonard, supra,* 40 Cal.4th at p. 1407; see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057.) The Attorney General does not dispute that the comments in this regard were improper.

Nevertheless, even though these comments were improper, defendant is not entitled to relief. Given the strength of the evidence against defendant, not the least of which was his jailhouse confession, he did not suffer prejudice from the prosecutor's comments. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957.) It was not reasonably probable that the verdict would have been more favorable without this misconduct.

### b. *Misstatements of Law*

Defendant claims that at the end of the guilt phase, the prosecution made a number of misstatements of law in closing argument.

For instance, with respect to the issue whether defendant withdrew from the conspiracy, the prosecution reiterated that defendant must "do everything in his power" to prevent the commission of the murder. Defendant maintains that the instruction misstates a defendant's burden of proof for withdrawal. Even assuming error, any misstatement was

harmless. There was no dispute that defendant committed an overt act, i.e., paying Moya to kill Pamela, which completed the crime of conspiracy. (See *People v. Sconce, supra*, 228 Cal.App.3d at p. 703 [defendant's "withdrawal from the conspiracy is not a valid defense to the completed crime of conspiracy"].)

Next, in describing defendant's liability as an aider and abettor, the prosecution used an analogy of a backup quarterback who never gets on the field but is still part of the team. Defendant claims this example misstated the law because it suggested a defendant's mere presence or knowledge, similar to sitting on a bench and doing nothing, is sufficient to impose liability as an aider and abettor. Defense counsel did not object to the football analogy and seek an admonition and therefore, has forfeited the claim. (See *Clark, supra*, 52 Cal.4th at p. 960.)

Defendant also argues that the prosecution misstated the law on the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)), which permits aider and abettor liability if the actual killer killed the victim while or immediately after lying in wait. (*People v. Johnson, supra*, 62 Cal.4th at p. 630; *People v. Bonilla, supra*, 41 Cal.4th at pp. 331-332 [construing identical language in § 190.2, former subd. (b) as statutory basis for aider and abettor's liability].) Defendant focuses on the prosecution's following statement about what defendant was doing right before Pamela was killed: "There is an argument that Mr. Fayed was actually lying in wait; he was sitting in a room, not five feet from Pamela Fayed thirty seconds before she was killed. So certainly he was concealing his purpose as well."

It was not reasonably likely the jury would have understood this remark to mean defendant's actions were

sufficient to prove lying in wait. (*People v. Osband, supra*, 13 Cal.4th at p. 689.) The prosecution's theory was not that defendant was the actual attacker, which would require that defendant intentionally killed Pamela by means of lying in wait. (*People v. Johnson, supra*, 62 Cal.4th at p. 630.) Rather, the prosecution consistently argued that "the three folks in the parking garage, Simmons, Marquez, and Moya. They were the ones lying in wait."

### c. *Reference to Extra-record Evidence*

#### (1) *Statements about federal subpoena*

In describing the telephone calls between defendant and Moya and Moya and his cohorts two months before Pamela's murder, the prosecution emphasized the timing of these calls, i.e., two days after the federal subpoena issued to the forensic accountants in the Fayeds' divorce was "leaked" on May 27, 2008. Referring to the "leaked" subpoena at least four times (without any objection from defendant), the prosecution explained that "[y]ou get the idea that in the hours after the subpoena is leaked, these guys communicate and talk with each other by way of text message and phone to let each other know." Based on his failure to timely object and seek an admonition, defendant has forfeited a challenge to the characterization that the subpoena was "leaked." (See *People v. Collins, supra,* 49 Cal.4th at p. 226.)

#### (2) *Statements about federal case*

On a related point, defendant argues that the prosecution misstated that defendant "knew" about the sealed federal indictment before Pamela's murder and that Pamela would definitely be a witness against defendant in the Goldfinger matter. Defendant forfeited the claim by failing to timely object

and request an admonition. (*People v. Collins*, *supra*, 49 Cal.4th at p. 209) In any event, the claim fails on the merits because the prosecution did not mischaracterize the facts but made reasonable inferences based on the record. (See *People v. Thomas* (2011) 51 Cal.4th 449, 494-495.) The prosecution stated that defendant and Pamela "knew exactly what was going on as early as May of 2008. 154 days before her murder, the indictment comes out." Fairly read, the statements merely underscored that defendant and Pamela were aware of the federal investigation against Goldfinger shortly before the indictment was filed. Also, Pamela's criminal defense attorney, Willingham, testified that "Pamela wanted to be cooperative" and be a "witness" against defendant. Any technical meaning defendant affixes to "witness" does not support his claim of mischaracterization by the prosecution.

### *(3) Statements about defendant's mental state*

In depicting defendant's anger at its height when Pamela tried to secure a money transmitting license, the prosecution described defendant as "enraged," "absolutely furious," "boiling over with rage" and "apoplectic." Defendant claims that these descriptions are not supported by the record. Not so. These are reasonable inferences based on the record, including defendant's outraged statements to Smith that Pamela "went out and made all these stupid accusations and ridiculous accusations against me just to try and make me look bad" and that with regard to defendant's million dollar e-currency business, "she would've fucked it all up." (See *People v. Hamilton, supra,* 45 Cal.4th at p. 928.) " 'Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence.' " (*People v. Redd* (2010) 48 Cal.4th 691, 750.)

### *(4) Statements about Carol Neve*

In recounting Neve's testimony about the money transmitting license, the prosecution reminded the jury that Neve testified that the licenses were "extraordinarily expensive." The prosecution followed up by stating that a license can cost "[l]iterally hundreds of thousands of dollars" and that the government imposes a high fee to "keep[] Madoff-type things from happening." Also, after the prosecution reminded the jury about "the evidence that Carol Neve told you, that Pamela Fayed wanted to get a money transference license," it claimed that Pamela later wrote a check to get the license that caused defendant "to go into a downward spiral."

On appeal, defendant complains that Neve did not testify to the actual cost of the license or that Pamela wrote a check for one. Defendant did not object and request an admonition. As such, he has forfeited the claim challenging this testimony. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1052.)

### *(5) Other statements*

Finally, for the first time on appeal, defendant challenges other statements in the prosecution's closing argument including comments that Moya does not know Mercedes and would not kill Pamela on Mercedes's behalf if "he doesn't think that she can pay up." Defendant also objects to the imagined telephone conversations and texts between Moya and defendant after Pamela was killed. Finally, he objects that the evidence regarding the state of Mercedes's finances or what Moya knew about her finances was not in the record and that the "invented" conversations between defendant and Moya were wholly outside the record. Defendant has forfeited the challenges to the statements based on his failure to timely object and seek an

admonition below. " 'The [prosecutor's] misstatements, although bearing a potential for prejudice, were not so extreme or so divorced from the record that they could not have been cured by prompt objections and admonitions.' " (*People v. Dennis*, *supra*, 17 Cal.4th at p. 521.)

## B. Penalty Phase

### 1. *Evidentiary Rulings*

#### a. *Admission of Letter Written by Pamela*

As victim impact evidence, the prosecution questioned Pamela's daughter, Desiree, about how the loss of her mother has affected her life. The prosecution sought to have Desiree read a letter purportedly written from her mother to both Desiree and J.F. To establish foundation, the prosecution explained the letter was found with Pamela's personal property in a storage shed available only to Pamela. Desiree had not yet seen the letter. Though initially sustaining defendant's objection that the letter was more prejudicial than probative, the trial court later permitted Desiree to read the letter.

The letter dated July 7, 2006 was read into the record: "To my dear sweet baby girls. Please hear me and know that I am forever with you. You are the fruit of my labor in this life and I am so proud of you both. Listen for my voice to guide you. I want so much to hold you in my arms and kiss your sweet faces for eternity. Please keep my family together with gentle love and understanding. You are all that exists for me now. Never abandon. Family is truly the only thing that is important. Protect each other at all costs. Love you with all my being. Mamma." During her direct testimony, Desiree read the letter in front of the jury. When the prosecution asked what Desiree thought as she looked into the future without her mother, she

responded: "[I]t saddens me and depresses me, and it not only affects mine and [J.F.]'s life and everyone involved right now, but it affects our future families." The prosecution also referred to the letter in its closing argument.

On appeal, defendant again argues that the letter was inadmissible hearsay and that the prosecution impermissibly "used the emotional letter as substantive evidence in closing arguments." We conclude the letter was properly admitted to show the effect of Pamela's death on her daughter. (*People v. Cruz* (2008) 44 Cal.4th 636, 682.)

"Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057.) The letter, which was clearly intended to be given to the girls on their mother's death, "demonstrated the relationship lost" as a result of Pamela's murder. (*People v. Verdugo, supra,* 50 Cal.4th at p. 299 ["Victim impact evidence is emotionally moving by its very nature, but that fact alone does not make it improper"].)

### b. *Admission of Photographs of Pamela's Gravesite*

During Desiree's testimony, the prosecution showed her a picture of her kneeling over her mother's casket and kissing it goodbye. Before Desiree testified, the prosecution had asked the trial court to rule on the admissibility of two photographs from Pamela's gravesite, which Desiree herself provided to the prosecution. The trial court allowed the two photographs, rejecting defense counsel's argument that the photographs were incendiary and cumulative. The two photographs were properly

admitted and not unduly emotional. (See *People v. Suff* (2014) 58 Cal.4th 1013, 1076 [four photos of children leaving notes at mother's grave admissible as "evidence of the impact her death had on them"]; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 368 [photo of victim's gravesite admissible "as 'further evidence relating to her death and the effect upon her family' "].)

### c. *Exclusion of defendant's mitigating evidence*

To present a "full scope of the family's life" and show that defendant had at one time loved Pamela, defense counsel sought to elicit testimony from defendant's high school friend, Melanie Jackman. Defense counsel asked Jackman if defendant had called her for advice on how to make Pamela happy. The trial court sustained the prosecution's hearsay objection.

Even assuming the trial court erred in excluding this evidence, any error was harmless. (See *People v. McDowell* (2012) 54 Cal.4th 395, 434 [improper exclusion of evidence at penalty phase subject to harmless error analysis].) It is likely that the jury would have given little weight to Jackman's testimony. The prosecution impeached Jackman's credibility by refuting her assertion that defendant had never said anything negative about Pamela; the prosecution showed Jackman e-mails defendant had sent to her, in which he called Pamela a "sociopathic-lying-money-grubbing whore" and a "Super-Bitch."

### 2. *Prosecutorial Misconduct at Penalty Phase*

Defendant raises two claims of prosecutorial misconduct at the penalty phase, i.e., improperly appealing to the jury's emotions during closing argument and arguing facts not in evidence. " ' "The same standard applicable to prosecutorial misconduct at the guilt phase is applicable at the penalty phase. [Citation.] A defendant must timely object and request a

curative instruction or admonishment." ' [Citation.] A defendant's 'failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 367.)

### a. *Improperly Appealing to the Passion and Prejudice of the Jury During Closing Argument*

During closing argument, the prosecution told the jury that they had a choice to make, i.e., they could either show defendant mercy and not impose the death penalty even though defendant deserves it or could impose the death penalty because it is the "appropriate" penalty: "Do you want to be the jury that gives mercy when he gave none? . . . [H]e's going to ask you for mercy when Pam Fayed had none of these?" On appeal, defendant maintains that by suggesting that justice and mercy are incompatible, the prosecution improperly appealed to the passions and prejudices of the jury. Defendant forfeited the issue by failing to object to this argument or request an admonition. We conclude it lacks merit in any event. "We have repeatedly approved prosecutors arguing that a defendant is not entitled to mercy, and in particular arguing that whether the defendant was merciful during the crimes should affect the jury's decision." (*People v. Gamache* (2010) 48 Cal.4th 347, 389-390 [citing cases].)

### b. *Arguing Facts Not in Evidence*

During closing argument, the prosecution told the jury that it will be instructed that it cannot consider sympathy for defendant's family—specifically Pamela and defendant's young daughter, J.F.—as a mitigating factor in sentencing. The prosecution underscored that defendant "cannot come in here

and use his last remaining card, his daughter, and sympathy for her as a human shield.  It doesn't work that way. You can't kill the child's mother and then say, don't make her an orphan because if you kill me, she doesn't have anybody left. . . . He didn't think about [J.F.] before.  He had a cold, calculated, deliberate, brutal, vicious plan that he set into motion.  And now to hide behind her is more cowardly than it was to dispatch your two-bit assassins to ambush your wife in that parking lot. "

Defendant claims that the prosecution referred to facts not in evidence because defendant never appealed to the jury on that basis.  We conclude there was no misconduct.  The prosecutor's argument was consistent with applicable law that "[t]he impact of a defendant's execution on his or her family may not be considered by the jury in mitigation." (*People v. Bennett* (2009) 45 Cal.4th 577, 601.)  To the extent the prosecution referred specifically to the impact on J.F., its argument was fair comment on J.F.'s tragic predicament of being the daughter of both the victim and the murderer.

Defendant also asserts the prosecution referred to facts outside the record by stating that Pamela "wasn't just risking her own safety in cooperating; she was offering a very direct and concrete benefit to the community in her willingness to cooperate with the federal authorities."  Defendant reiterates that there was no evidence that Pamela was cooperating with the government and that certainly there was no evidence she was providing some "concrete benefit" to the community.  Defendant also complains that the prosecution's account of what Pamela's last thoughts were (i.e., defendant "won. That's what she's thinking.  He won.  He got me") was not contained in the record.

There was no misconduct. While there was no evidence of a formal agreement that Pamela would cooperate with the federal government against defendant, as the record makes clear, Pamela told her criminal defense attorney, Willingham, that she intended to testify against defendant. The prosecution's argument was fair comment based on the evidence. Moreover, any benefit that Pamela's cooperation would give the community—arguably, because Goldfinger would no longer provide illegal Ponzi schemes a means to launder their money—was also fair comment. Finally, any fictional depiction of what Pamela was thinking before she died was within the bounds of permissible comment. (See *People v. Wash*, *supra*, 6 Cal.4th at p. 263 [permissible to ask jury at penalty phase " 'what was going through [the] mind' of the victim"].)

### 3. *Cumulative Error*

Defendant argues that the cumulative effect of the alleged guilt and penalty phase errors was prejudicial. We have determined that one instance of prosecutorial misconduct committed at the guilt phase (see *ante*, pp. 79-80) was not prejudicial. We have also assumed error in several instances (see *ante*, at pp. 39, 63-64, 68, 70-71, 80-81, 87), but found no error prejudicial. We are not persuaded there was a reasonable possibility that, absent any of these errors either alone or combined, the jury would have reached a different verdict. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1208.)

### 4. *Conflict of Interest*

Though we conclude that defendant did not suffer prejudice from the misconduct of Prosecutor Jackson at the guilt phase, we highlight a troubling development related to this issue. Before oral argument in this matter was set to take place,

we discovered that Jackson had become a named partner at defense counsel Mark Werksman's law firm. Though it is unclear exactly when this partnership formed, there is no indication that Jackson joined Werksman's firm before or at the time defense counsel filed defendant's opening brief in this appeal. Our request for supplemental briefing from the parties and the public at large, moreover, yielded no response suggesting that in light of any conflict of interest, this court should refrain from deciding the issues raised on appeal.

In any event, because the partnership between Jackson and Werksman began *after* defendant's capital trial ended, relevant facts relating to any conflict of interest issue are not part of the record. As such, we do not address any potential conflict of interest claim here. (See *People v. Doolin* (2009) 45 Cal.4th 390, 429 ["defendant has the opportunity to expand upon the record in the context of his right to pursue a writ of habeas corpus" ].) That said, the law partnership between defense counsel and the prosecutor in this case gives us great pause. (See Rules Prof. Conduct, rules 1.7, 1.11; Bus. & Prof. Code, § 6131, subd. (a).) We underscore that our resolution of defendant's appellate claims in this case does not in any way endorse or sanction this posttrial partnership.

## C. Challenges to Death Penalty

Defendant makes a number of challenges to the death penalty, all of which we have considered and rejected in the past. Because he offers no compelling reason to reconsider our long-standing precedent, we decline to do so. We will instead dispose of each claim without extended analysis.

"The death penalty is not unconstitutional for failing broadly to 'adequately narrow the class of murderers eligible for

the death penalty.' " (*People v. Simon* (2016) 1 Cal.5th 98, 149.) Contrary to defendant's claim, we " 'repeatedly have held that consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty.' " (*People v. Brasure* (2008) 42 Cal.4th 1037, 1066.)  Nor is the death penalty unconstitutional for not requiring "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)  This conclusion, moreover, is not undermined by the high court's decisions in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Apprendi v. New Jersey* (2000) 530 U.S. 466, or *Ring v. Arizona* (2002) 536 U.S. 584.  (*People v. Rangel*, at p. 1235.)

The trial court is not required to instruct the jury that there is no burden of proof at the penalty phase.  (*People v. Streeter* (2011) 52 Cal.4th 610, 268.)  Nor  does the trial court's failure to instruct that there is a " ' "presumption of life" ' " violate a defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his or her sentence, and to equal protection of the laws under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution.  (*People v. Cage* (2015) 62 Cal.4th 256, 293.)

"The death penalty is not unconstitutional for failing to require that the jury base any death sentence on written findings." (*People v. Elliot* (2005) 37 Cal.4th 453, 488.)  "The phrase 'whether or not' in section 190.3, factors (d)-(h) and (j) does not unconstitutionally suggest that the absence of a

mitigating factor is to be considered as an aggravating circumstance." (*People v. Wall* (2017) 3 Cal.5th 1048, 1073.) " 'We have consistently held that unanimity with respect to aggravating factors is not required by statute or as a constitutional procedural safeguard.' " (*Ibid.*)

"Use in the sentencing factors of such adjectives as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id.*, factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 614–615.) Nor does the use of unadjudicated offenses under section 190.3, factor (b) in capital proceedings, but not in noncapital matters, violate the equal protection clause or due process principles. (*People v. Delgado* (2017) 2 Cal.5th 544, 591.)

The equal protection clause does not require that the state's capital sentencing scheme provide the same procedural protections provided to noncapital defendants. (*People v. Henriquez* (2017) 4 Cal.5th 1, 46.) Nor does the federal Constitution require intercase proportionality review. (*Ibid.*)

"International norms and treaties do not render the death penalty unconstitutional as applied in this state." (*People v. Simon, supra,* 1 Cal.5th at p. 150.) We have consistently found that "there are no constitutional or international law infirmities in the death penalty law . . . ." (*People v. Weaver* (2012) 53 Cal.4th 1056, 1093.)

## CONCLUSION

We affirm the judgment.

CHIN, J.

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Fayed
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S198132
**Date Filed:** April 2, 2020
_____

**Court:** Superior
**County:** Los Angeles
**Judge**: Kathleen Kennedy

_____

**Counsel:**

Law Offices of Mark J. Werksman, Mark J. Werksman and Kelly C. Quinn for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kelly C. Quinn
Law Offices of Mark J. Werksman
888 W. Sixth Street, Fourth Floor
Los Angeles, CA 90017
(213) 688-0460

Idan Ivri
Deputy Attorney General
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6168